269 P.3d 740

STATE of Hawai'i, Respondent/Plaintiff–
Appellee,

v.

Daniel TAYLOR, Petitioner/Defendant–
Appellant.

No. SCWC–28904.

Supreme Court of Hawai'i.

Dec. 15, 2011.

Todd Eddins, Honolulu, for petitioner/defendant-appellant.

Kimberly Tsumoto Guidry and Girard D. Lau, Deputy Attorneys General, for respondent/plaintiff-appellee.

RECKTENWALD, C.J., NAKAYAMA, DUFFY, and McKENNA, JJ., with ACOBA, J., concurring and dissenting separately.

Opinion of the Court by
RECKTENWALD, C.J.

In 2006, Daniel Taylor pled guilty in the United States District Court for the District of Hawai'i to conspiracy to traffic in Native American cultural items that were obtained in violation of the Native American Grave Protection and Repatriation Act (NAGPRA). The items were native Hawaiian artifacts that had been repatriated to Kanupa Cave on the island of Hawai'i, and that were subsequently taken from the cave by Taylor and an accomplice. Approximately a year later, a State of Hawai'i grand jury indicted Taylor for Theft in the First Degree in violation of Hawai'i Revised Statutes (HRS) §§ 708–830(1) and 708–830.5(1)(a), quoted *infra*, with regard to the same events. Taylor moved to dismiss the indictment on various grounds. The circuit court denied Taylor's motion,[1] and Taylor appealed.

In the Intermediate Court of Appeals, Taylor argued, inter alia, that the evidence presented to the grand jury failed to establish that the artifacts were "property of another" as required under HRS § 708–830(1). Taylor further argued that his prosecution in state court was barred by HRS § 701–112, quoted *infra*, because he was previously convicted in federal court for conspiracy to traffic in Native American cultural items, i.e., the Kanupa Cave artifacts.

The ICA affirmed, holding that the evidence was sufficient to support the indictment and noting that "specification of the actual owner of the property for purposes of this theft charge is not required and only evidence that the property was not that of Taylor is required." *State v. Taylor*, No. 28904, 2011 WL 661793, at *9–10 (App. Feb. 23, 2011) (mem.op.). The ICA further held that HRS § 701–112 did not bar Taylor's theft prosecution, because theft in the first degree requires proof of facts not required for the federal conspiracy and trafficking offenses, and the primary purposes behind the state and federal offenses differed. *Id.* at *3–4.

In his application for a writ of certiorari, Taylor raises the following two questions:

1. ... Does the State establish that an item is "property of another" simply by proving that the defendant did not own it, or must the State prove something more to establish that an item is an article of value that someone other than the defendant possesses or has some other interest in and therefore within the statutory definition of "property of another"?

2. ... Does the offense of first-degree theft, as alleged against [Taylor] in this matter, require proof of a fact that the federal offense of conspiracy, as it was proven to convict [Taylor], did not require?

We conclude that the ICA erred in stating that "only evidence that the property was not that of Taylor [was] required" to establish that the artifacts were the "property of another." However, we hold that the State nonetheless presented sufficient evidence to the grand jury to find probable cause that the property taken was "property of another." We further hold that Taylor's prosecution in state court is not barred by HRS § 701–112 because the theft charge requires proof of a fact not required for his federal conspiracy offense, and the purposes behind the state and federal statutes differ. Accordingly, we affirm the judgment of the ICA.[2]

---

1. The Honorable Glenn S. Hara presided.

2. We note that the ICA's Memorandum Opinion and Judgment on Appeal purported to affirm the circuit court's December 13, 2007 "Order Grant-

ing Ex Parte Motion to Certify Order Denying Defendant's Motion to Dismiss Indictment and Second Motion to Dismiss for Interlocutory Appeal Pursuant to H.R.S. § 641–17." *Taylor,*

## I. Background

The following factual background is taken from the record on appeal, including a transcript of the grand jury proceeding and transcripts of the proceedings before the circuit court on Taylor's first motion to dismiss. The record also contains copies of documents from Taylor's federal prosecution, including the charging document, Taylor's plea agreement, and transcripts of proceedings before the federal district court.

### A. Proceedings in federal district court

On March 24, 2006, the United States charged Taylor by information with Conspiracy to Traffic in Native American cultural items in violation of 18 United States Code (U.S.C.) § 371, quoted *infra*, and Trafficking in Native American cultural items in violation of 18 U.S.C. § 1170(b),[3] which imposes sanctions for violations of NAGPRA, discussed *infra*.

That same day, the federal government filed a Memorandum of Plea Agreement (Plea Agreement) in which Taylor agreed to plead guilty to conspiring to sell, use for profit, and transport for sale and profit Native American cultural items, which were obtained in violation of 18 U.S.C. § 1170(b), in the time period "by and including June 2004."[4] In exchange for Taylor's guilty plea, the federal government dismissed the trafficking charge against Taylor and agreed not to seek additional charges related to the taking and selling of Native American cultural items from about June 2004 through August 2004. Taylor was subsequently found guilty on the conspiracy count.

In the Plea Agreement, Taylor admitted the following facts, outlining "what happened in relation to the charge to which [Taylor pled] guilty:"

a. From a precise earlier date unknown but by and including June 2004, in the District of Hawai'i, [Taylor] did knowingly and willfully conspire and agree with others both known and unknown, including with his co-defendant, JOHN CARTA, to commit offenses against the United States, namely, to sell, use for profit, and transport for sale and profit Native American cultural items obtained in violation of [NAGPRA], to wit: Native Hawaiian artifacts that had been repatriated and re-buried at Kanupa Cave located on the island of Hawai'i, violations of [18 U.S.C. §§ 371 and 1170(b) ].

b. In 2000, JOHN CARTA had a conversation with an individual identified by initials as M.F., who informed him of the existence of a cave containing Native Hawaiian artifacts. According to M.F., the cave was located on the Kawaihae side of the island of Hawai'i.

c. Subsequently, but at some precise date prior to June 16, 2004, [Taylor] and JOHN CARTA agreed to find the cave with the understanding that they would sell any artifacts they discovered for a profit.

---

2011 WL 661793, at *10. However, Taylor's Notice of Interlocutory Appeal appealed from the circuit court's November 14, 2007 order denying his motion to dismiss the indictment. Moreover, Taylor's opening brief to the ICA presented argument solely as to that order. In addition, the ICA's memorandum opinion concluded that the circuit court properly denied Taylor's motion to dismiss the indictment. *Id.* at *9. Neither Taylor's opening brief nor the ICA's memorandum opinion asserted that the circuit court erred in granting Taylor leave to file an interlocutory appeal. *See id.*

Accordingly, we view the reference in the ICA's judgment to the circuit court's December 13, 2007 order as a clerical error. We thus affirm the ICA's judgment, which, as corrected by this opinion, affirmed the circuit court's November 14, 2007 order denying Taylor's motion to dismiss the indictment.

**3.** 18 U.S.C. § 1170(b) (1994), concerning illegal trafficking in Native American human remains and cultural items, provides:

> Whoever knowingly sells, purchases, uses for profit, or transports for sale or profit any Native American cultural items obtained in violation of the Native American Grave Protection and Repatriation Act shall be fined in accordance with this title, imprisoned not more than one year, or both, and in the case of a second or subsequent violation, be fined in accordance with this title, imprisoned not more than 5 years, or both.

**4.** The Plea Agreement was incorporated into the record on appeal as an exhibit to Taylor's motion to dismiss.

d. On or about June 16, 2004, [Taylor] and JOHN CARTA acted on their agreement to find the cave. On or about June 17, 2004, [Taylor] and JOHN CARTA obtained directions from M.F. and found the cave, later identified as Kanupa Cave. They pushed aside a rock sitting across the cave's entrance and entered. [Taylor] and JOHN CARTA discovered a number of items wrapped in woven lauhala baskets and black cloth. They unwrapped the items and determined they were Native Hawaiian artifacts, including items such as wooden bowls, a gourd, a holua sled runner, a spear, kapa, and cordage. Several of the artifacts contained labels indicating they belonged to the J.S. Emerson Collection, which was a collection of artifacts taken from Kanupa Cave in the late 1800's and sold to museums, including the Bishop Museum in Honolulu, Hawai'i. These items were repatriated and re-buried at Kanupa Cave in November 2003.

e. [Taylor] and JOHN CARTA removed approximately 157 artifacts from Kanupa Cave.

f. [Taylor] sold or attempted to sell artifacts obtained from Kanupa Cave for a profit as follows:

(i) On or about June 17, 2004, [Taylor] contacted a collector and attempted to sell to that collector a palaoa taken from Kanupa Cave for $40,000.

(ii) On or about June 26, 2004, [Taylor] sold a piece of kapa from Kanupa Cave to a tourist for $150.

(iii) On or about July 11, 2004, [Taylor] sold a fisherman's bowl and cover taken from Kanupa Cave to a collector for $2,083.

iv. [sic] On or about July 13, 2004, [Taylor] had posted for sale on the internet a kupee taken from Kanupa Cave for $5,600.

g. [Taylor] knew the artifacts belonged to the J.S. Emerson Collection. To conceal the fact that some of the artifacts belonged to a well-known collection, [Taylor] removed the J.S. Emerson Collection labels from these artifacts.

On June 12, 2007, the federal district court filed its judgment, adjudicating Taylor guilty and sentencing him to, inter alia, eleven months of imprisonment followed by one year of supervised release.

## B. Proceedings in circuit court

### 1. Grand jury proceedings

On May 23, 2007, the State sought a grand jury indictment against Taylor for Theft in the First Degree in violation of HRS §§ 708–830(1)[5] and 708–830.5(1)(a).[6] The State presented the testimony of one witness: Abraham Kaikana, a special agent with the Office of the Attorney General. Agent Kaikana testified that he had reviewed reports from both the state and federal investigations in Taylor's case, interviews from the federal investigation, and Taylor's memorandum of plea agreement with the federal government. Agent Kaikana also testified that he interviewed various individuals in relation to Taylor's case.

With regard to the artifacts, Agent Kaikana testified that a surveyor named Joseph Swift Emerson "was shown Kanupa Cave at one time in the 1800s and he took artifacts out of that cave and then he sold part of that to the Bishop Museum and the Peabody [Essex] Museum in Massachusettes [sic]." Agent Kaikana testified that J.S. Emerson would put tags or labels on the items he collected "to document them for future use."[7] Some of the items taken by J.S. Emerson were "eventually repatriated from both the Bishop Museum and the Peabody

---

**5.** HRS § 708–830(1) (1993) provides:
A person commits theft if the person ... [o]btains or exerts unauthorized control over property. A person obtains, or exerts control over, the property of another with intent to deprive the other of the property.

**6.** HRS § 708–830.5(1)(a) (1993) provides: "A person commits the offense of theft in the first degree if the person commits theft ... [o]f prop-

erty or services, the value of which exceeds $20,-000[.]"

**7.** Agent Kaikana testified that Taylor acknowledged in his memorandum of plea agreement that he "saw Emerson tags on the items when he went into the cave[,]" and that he removed the tags "[t]o hide or conceal the sale of these items[.]"

Essex [Museum]" and were "reburied" at Kanupa Cave. The groups involved with the reburial included "Hui Malama, ... OHA, [the] State, and the Bishop Museum."[8]

Agent Kaikana also testified that Taylor and his wife "own or owned an antique shop" in Captain Cook, Hawai'i, where "they would sell, buy, [and] trade, [ ] antiquities." Agent Kaikana testified that he interviewed and reviewed the federal government's interview of two witnesses who identified artifacts from the "J.S. Emerson Collection" in Taylor's shop. Agent Kaikana also testified regarding the recovery of Kanupa Cave artifacts from Taylor's home after the federal government executed a search warrant on Taylor's home and shop. Agent Kaikana testified that other Kanupa Cave artifacts, including a palaoa and kupe'e, bearing J.S. Emerson and Bishop Museum labels were recovered in a Tupperware container at the Pu'uhonua o Honaunau National Park on the island of Hawai'i. The agent testified that it appeared that they had been "dumped" there. Finally, Agent Kaikana testified that he met with an appraiser, who valued the items Taylor had taken from Kanupa Cave, including the palaoa and kupe'e, from $800,000 to $1.2 million. The grand jury returned a true bill.

On May 24, 2007, the grand jury's indictment was filed, charging Taylor with Theft in the First Degree in violation of HRS §§ 708–830(1) and 708–830.5(1)(a). The indictment provided:

> On or about the 17th day of June, 2004, in the County of Hawai'i, State of Hawai'i, [ ] TAYLOR, did obtain or exert unauthorized control over the property of another, to wit: artifacts from Kanupa Cave, having a value which exceeds Twenty Thousand Dollars ($20,000), with intent to deprive the other of the property, thereby committing the offense of Theft in the First Degree in violation of [HRS §§ 708–830(1) and 708–830.5(1)(a) ].

### 2. Taylor's motions in circuit court

On July 24, 2007, Taylor filed a motion to dismiss the indictment. Taylor argued, inter alia, that "the artifacts predicating the State's indictment are not the 'property of another' under HRS § 708–800"[9] and that the indictment charged Taylor for an offense that he already had been prosecuted for in federal district court in violation of HRS § 701–112.[10] The State argued, inter alia, that it was only required to prove that the property belonged to someone other than Taylor. The State also argued that the in-

8. Agent Kaikana did not explain to the grand jury what "Hui Malama" or "OHA" were, although the latter was presumably a reference to the Office of Hawaiian Affairs. NAGPRA identifies Hui Malama I Na Kupuna O Hawai'i Nei as a "nonprofit, Native Hawaiian organization incorporated under the laws of the State of Hawai'i by that name on April 17, 1989, for the purpose of providing guidance and expertise in decisions dealing with Native Hawaiian cultural issues, particularly burial issues." 25 U.S.C. § 3001(6) (1990). NAGPRA identifies the Office of Hawaiian Affairs as an entity "established by the constitution of the State of Hawai'i." 25 U.S.C. § 3001(12); see also Haw. Const. art. XII, § 5 (establishing the Office of Hawaiian Affairs); HRS chapter 10 (concerning the Office of Hawaiian Affairs). NAGPRA further defines a "Native Hawaiian organization" as "any organization which—(A) serves and represents the interests of Native Hawaiians, (B) has as a primary and stated purpose the provision of services to Native Hawaiians, and (C) has expertise in Native Hawaiian Affairs, and shall include the Office of Hawaiian Affairs and Hui Malama I Na Kupuna O Hawai'i Nei." 25 U.S.C. § 3001(11).

9. HRS § 708–800 (1993) defines "property of another" for purposes of HRS § 708–830(1) as

"property which any person, other than the defendant, has possession of or any other interest in, even though that possession or interest is unlawful; however, a security interest is not an interest in property, even if title is in the secured party pursuant to the security agreement."

10. HRS § 701–112 (1993) provides, in pertinent part:

> When behavior constitutes an offense within the concurrent jurisdiction of this State and of the United States or another state, a prosecution in any such other jurisdiction is a bar to a subsequent prosecution in this State under any of the following circumstances:
> (1) The first prosecution resulted in an acquittal which has not subsequently been set aside or in a conviction as defined in section 701–110(3), and the subsequent prosecution is based on the same conduct, unless:
> (a) The offense for which the defendant is subsequently prosecuted requires proof of a fact not required by the former offense and the law defining each of the offenses is intended to prevent a substantially different harm or evil[.]

stant prosecution was not barred by HRS § 701–112 because the two-pronged exception set forth in HRS § 701–112(1)(a) was met in this case. The State contended that the offense of theft in the first degree "require[d] proof of a fact not required by the former prosecution in the [federal district court], namely that the value of the property exceeds $20,000[,]" and that "the law defining each of the offenses is intended to prevent a substantially different harm or evil."

On August 30, 2007, the circuit court held a hearing on Taylor's motion to dismiss. Regarding Taylor's "property of another" argument, the circuit court indicated that it thought HRS chapter 6E, concerning historic preservation, applied and ordered the parties to provide a supplemental memorandum on the topic. At the conclusion of the hearing, the circuit court took the matter under advisement. The State subsequently filed a supplemental memorandum in opposition to the motion to dismiss in which it argued that the artifacts were the "historic property" of the State, pursuant to HRS § 6E–7.[11] Attached to the supplemental memorandum was a declaration of Deputy Attorney General Mark K. Miyahira, declaring that "documentation indicates that Kanupa Cave is located on State-owned land on the island of Hawai'i," and that "the artifacts that are the basis of this prosecution are more than fifty (50) years old." Taylor argued in his supplemental memorandum in support of his motion to dismiss that "neither the State nor anyone else has possession of the artifacts[ ]" because, pursuant to HRS § 6E–7(c),[12] the "State's interest in the artifacts is solely to 'preserve' them for 'proper disposition' to the lineal or cultural descendants of the people with whom the artifacts were interred." [13]

### 3. Circuit court ruling

On October 5, 2007, the circuit court issued a Memorandum of Decision on Defendant's Motion to Dismiss, denying Taylor's motion. The circuit court found, inter alia, that the indictment properly charged Taylor with obtaining control over the "property of another" pursuant to *State v. Nases*, 65 Haw. 217, 218, 649 P.2d 1138, 1139 (1982),[14] and that Taylor's theft prosecution was not barred by his federal conviction pursuant to HRS § 701–112.

On November 14, 2007, the circuit court issued its Findings of Fact (FOFs), Conclusions of Law (COLs), and Order denying Taylor's motion to dismiss the indictment. In its FOFs/COLs, the circuit court recounted the factual background leading up to Taylor's federal prosecution and his indictment in state court and then stated, in relevant part, as follows:

### FINDINGS OF FACT

. . . .

9. . . . this [c]ourt finds and concludes that [Taylor] has not shown at this time

---

**11.** HRS § 6E–7(a) (1993) provides: "All historic property located on lands or under waters owned or controlled by the State shall be the property of the State. The control and management of the historic property shall be vested in the [Department of Land and Natural Resources]."

HRS § 6E–2 (1993) defines "historic property[,]" as used in HRS chapter 6E, as "any building, structure, object, district, area, or site, including heiau and underwater site, which is over fifty years old."

**12.** HRS § 6E–7(c) (1993) provides: "The State shall hold known burial sites located on lands or under waters owned or controlled by the State in trust for preservation or proper disposition by the lineal or cultural descendants."

HRS § 6E–2 defines "burial site" as "any specific unmarked location where prehistoric or historic human skeletal remains and their associated burial goods are interred, and its immediate surrounding archaeological context, deemed a unique class of historic property and not otherwise included in section 6E–41."

HRS § 6E–2 defines a "burial good" as "any item reasonably believed to have been intentionally placed with the human skeletal remains of an individual or individuals at the time of burial."

**13.** On September 13, 2007, Taylor filed a second motion to dismiss, arguing primarily that a theft conviction would violate the rule set forth in *State v. Modica*, 58 Haw. 249, 250–51, 567 P.2d 420, 421–22 (1977). The circuit court denied the motion. Because this second motion to dismiss is not at issue in the instant appeal, we do not discuss it further.

**14.** As discussed further *infra*, *Nases* held that the "naming of the person owning the property in the indictment is surplusage." 65 Haw. at 218, 649 P.2d at 1139 (citations omitted).

that one of the sovereigns is acting as a tool of the other or that the second prosecution by the state in this case is a sham or cover for the federal prosecution.

## CONCLUSIONS OF LAW

. . . .

4. The charged offense of Theft in the First Degree in this state prosecution requires the proof of elements not required by the federal offense of Conspiracy to Traffic in Native American cultural items. Theft in the First Degree requires proof that the defendant obtained and exerted unauthorized control or [sic] property of another. This requirement is substantially different and more stringent than the requirement of the overt act under the federal charge, in this case being the removal of property from the Kanupa Cave. Additionally, the state charge requires the property be that of another. There is no allegation of this element in the federal information against [Taylor]. The state charge also requires the additional element of proof that the value of the property taken exceeds $20,000, while the federal charge requires no such proof. There is also the specific intent requirement under the state charge, that the offense be committed "with intent to deprive the other of the property," which is not a requirement under the federal charge. Therefore, it is clear that the state offense requires proof of a fact not required by the former offense.

5. The law defining each of the offenses is intended to prevent a substantially different harm or evil. The federal offense charged is a conspiracy in violation of 18 U.S.C[.] § 371. The offense against the United States, which is the target of the conspiracy, is the illegal trafficking of Native American cultural items in violation of 18 U.S.C. § 1170(b). The obvious import of this law is to discourage the illegal marketing of such cultural items. Apparently such illegal trafficking can occur even when an object is obtained in a manner that may not constitute theft. In *U.S. v. Corrow,* 941 F.Supp. 1553 (D.N.M.1996), *aff'd* 119 F.3d 796 (10th Cir.1997), the de-

fendant was convicted for agreeing to sell a Navajo ceremonial mask which he had purchased from a Navajo chanter's widow, in violation of 18 U.S.C. § 1170(b). This case illustrates that it is the trafficking of these cultural objects and not their theft that constitutes the acts prohibited by 18 U.S.C. § 1170(b). Arguably, 18 U.S.C. § 1170(b) seeks to protect the interests of the various Native American cultures and the objects related to their cultural heritage and history. This is a far different interest from Hawai'i's theft statute which protects persons from being deprived of property rights by unauthorized takings. Therefore, it is clear that the law defining each of the offenses is intended to prevent a substantially different harm or evil.

6. Since the conditions of H.R.S. § 701–112(1)(a) have been shown to exist in this case, the current state prosecution is not barred by [Taylor's] conviction in the federal case.

. . . .

15. The indictment in the state theft cases alleges, *inter alia,* that [Taylor] "did obtain or exert unauthorized control over the property of another . . ." [Taylor] alleges that the property belongs to no one. The State alleges that it has a property interest in the property due to [HRS § 6E–7] which states "All historic property located on lands or under waters owned or controlled by the State shall be the property of the State."

16. The statutory definitions in [HRS] § 708–800, [ ] of the terms, "control over property", "obtain", "property of another", and "unauthorized control over property" leads to the conclusion, as held in [*Nases,* 65 Haw. at 218, 649 P.2d at 1139], that "where the offense is obtaining control over the property of another, proof that the property was the property of another is all that is necessary and the naming of the person owning the property in the indictment is surplusage." In other words, the elements, "unauthorized control of the property of another" of theft, make it an offense for a person to exert control over property when he is not authorized by the

person who has possession of or any other interest in the same property.

(Some ellipses in original).

On December 13, 2007, Taylor filed, and the circuit court granted, a motion for an interlocutory appeal pursuant to HRS § 641–17.[15] On December 14, 2007, Taylor filed a notice of interlocutory appeal.

## C. ICA Appeal

### 1. Taylor's arguments

In his opening brief to the ICA, Taylor contended that the circuit court erred in denying his "claim that, as a matter of law, the artifacts were not 'property of another' for purposes of HRS §§ 708–800, 708–830(1), and 708–830.5(1)(a)." Taylor argued that the indictment was based on the State's theory that the artifacts were "property of the museums that once cared for them[,]" but "neither [the Bishop nor the Peabody Essex Museums] possessed the artifacts or retained *any* sort of property interest in them after they were repatriated under NAGPRA." (Emphasis in original). Taylor contended that "NAGPRA confirms that ownership in such artifacts resides solely in the appropriate Native Hawaiian organization[.]" Consequently, Taylor argued that "[t]o properly indict someone for stealing repatriated artifacts from a site such as Kanupa Cave, the State's presentation to the grand jury must identify the Native Hawaiian organization to whom the artifacts were repatriated, since that entity is the only 'person,' for purposes of HRS § 708–800's definition of 'property of another,' who possess[es] and retains all other property interests in such artifacts." Taylor also argued that NAGPRA preempted HRS §§ 6E–1 and 6E–7.

Taylor further argued that the circuit court erroneously denied his HRS § 701–112 claim because the state offense of theft in the first degree and the federal offense of conspiracy to traffic in native Hawaiian artifacts required proof of the same facts. Taylor also argued that the legislatures that enacted the laws defining each of the two offenses did not intend to prevent substantially different harms or evils.[16]

### 2. The State's arguments

The State did not explicitly address Taylor's sufficiency of the evidence argument, but instead contended that it need not, under *Nases*, "name the artifacts' actual owner in the charging document[ ]" and that the "indictment contain[ed] the necessary charging information: that [Taylor] 'did obtain or exert unauthorized control over the property of another.'" The State further argued that it was "important" that Taylor could not claim "ownership in the stolen property[ and, f]or this reason, it makes no difference whether the artifacts are owned by the repatriating museums, the Native Hawaiian groups that reburied the artifacts, or the State itself." Moreover, the State argued that it has a statutory interest pursuant to HRS chapter 6E to all historic property on State land and a common law interest in property buried on its land.

Regarding Taylor's HRS § 701–112 claim, the State argued that Taylor "was federally convicted, and then prosecuted by the State, for entirely *different* criminal conduct[,]" (emphasis in original) and that the charged offenses required proof of "different elements[.]" The theft indictment focused on Taylor "obtaining control over another's property, with the intent to deprive[,]" while the federal conviction involved "conspiracy to illegally traffic Native Hawaiian cultural items obtained in violation of NAGPRA." (Emphasis omitted). The State also argued that the statutes defining the state and federal offenses were "intended to prevent 'sub-

---

**15.** HRS § 641–17 (Supp.2004) provides:

Upon application made within the time provided by the rules of court, an appeal in a criminal matter may be allowed to a defendant from the circuit court to the intermediate appellate court, subject to chapter 602, from a decision denying a motion to dismiss or from other interlocutory orders, decisions, or judgments, whenever the judge in the judge's discretion

may think the same advisable for a more speedy termination of the case. The refusal of the judge to allow an interlocutory appeal to the appellate court shall not be reviewable by any other court.

**16.** Taylor raised two other points of error to the ICA that are not challenged in his application and will not be addressed further.

stantially different harm[s] or evil[s].'" (Brackets in original).

### 3. The ICA's decision

In its February 23, 2011, Memorandum Opinion, the ICA found, relying on *Nases*, that the artifacts did not belong to Taylor in light of evidence that the artifacts once were possessed by Emerson and the museums and that the State, Hui Malama, OHA, and Bishop Museum participated in the repatriation and reburial at Kanupa Cave. The identity of the actual owner of the artifacts is not required, and the evidence on appeal reveals the previous possession of the artifacts Collection, its sale of the artifact and Peabody [Essex] Museums, and the State and other entities in the repatriation of the artifacts from the museums and reburial in Kanupa Cave. Irrespective of the State's later assertion that it owned the artifacts, specification of the actual owner of the property for purposes of this theft charge is not required and *only evidence that the property was not that of Taylor is required.*

*Taylor*, 2011 WL 661793, at *9 (emphasis added).

The ICA declined to address Taylor's preemption arguments, which it found were not necessary to the disposition of Taylor's case. *Id.*

Regarding Taylor's HRS § 701–112 claim, the ICA found that theft in the first degree "requires proof of the facts that the item taken had a value of over $20,000 and the person intended to deprive the owner of the property[,]" which "were not required for the federal conspiracy and trafficking offenses." *Id.* at *3. The ICA also held that the primary purpose of the state theft statute was to "protect[ ] owners from the deprivation of their property." *Id.* at *4. The ICA concluded that this purpose differed from the two purposes of the federal conspiracy statute, which are to "protect[ ] society from the dangers of concerted criminal activity" and stop "threat[s] to social order[,]" and of NAGPRA, whose primary purpose "is to assist

Native Americans in the repatriation of items that the tribes consider sacred[.]" *Id.* at *4 (internal quotation marks and citations omitted).

Accordingly, the ICA affirmed the circuit court's December 13, 2007, order.[17] *Id.* at *10. The ICA entered its judgment on March 16, 2011. Taylor timely filed his application for a writ of certiorari on May 18, 2011. The State timely filed a response on June 2, 2011.

## II. Standards of Review

### A. Sufficiency of evidence to support an indictment

■ In their briefs to the ICA, the parties disputed the applicable standard of review for a motion to dismiss an indictment. Taylor asserted that the applicable standard was de novo based on *Wright v. Home Depot U.S.A., Inc.*, 111 Hawai'i 401, 407, 142 P.3d 265, 271 (2006), because the questions before the ICA involved statutory interpretation. The State argued that the applicable standard for appellate court review of a circuit court's motion to dismiss was an abuse of discretion pursuant to *State v. Akau*, 118 Hawai'i 44, 51, 185 P.3d 229, 236 (2008).

In cases involving allegations of prosecutorial abuse or misconduct, this court has applied an abuse of discretion standard when reviewing a motion to dismiss an indictment. *See, e.g., State v. Mendonca*, 68 Haw. 280, 282–83, 711 P.2d 731, 733–34 (1985) (involving an allegation that the State improperly indicted the defendant under one statute instead of a second statute). Nevertheless, in cases involving sufficiency of the evidence to support an indictment, this court appeared to apply a de novo standard. *See, e.g., State v. Ontai*, 84 Hawai'i 56, 59, 64, 929 P.2d 69, 72, 77 (1996) (discussing a conclusion of law, but evaluating the evidence presented to the grand jury de novo); *see also State v. Ganal*, 81 Hawai'i 358, 367, 917 P.2d 370, 379 (1996) (although this court did not explicitly identify the standard of review it was applying, this

---

17. As noted *supra* in note 2, we interpret the reference to the December 13, 2007 order as a clerical error.

court evaluated the totality of the evidence presented to the grand jury and concluded that the evidence presented to the grand jury was sufficient to elicit a strong suspicion and to support an inference that the defendant committed a crime).

Therefore, because the instant case involves sufficiency of the evidence to support an indictment, we review the circuit court's order de novo. *See Ontai,* 84 Hawai'i at 59, 64, 929 P.2d at 72, 77; *Ganal,* 81 Hawai'i at 367, 917 P.2d at 379.

■ Moreover, as this court noted in *Ganal:*

> In reviewing the sufficiency of the evidence to establish probable cause before the grand jury, every legitimate inference that may be drawn from the evidence must be drawn in favor of the indictment and neither the trial court nor the appellate court on review may substitute its judgment as to the weight of the evidence for that of the Grand Jury. The evidence to support an indictment need not be sufficient to support a conviction.

*Id.* at 367, 917 P.2d at 379 (internal quotation marks, citation and brackets omitted).

**B. Motion to dismiss indictment pursuant to HRS § 701–112**

■ "As the issue on appeal is strictly a matter of law, the standard of review is *de novo.*" *State v. Myers,* 100 Hawai'i 132, 134, 58 P.3d 643, 645 (2002) (citation omitted).

**III. Discussion**

As set forth below, Taylor's indictment for theft alleged all of the essential elements of the offense and the State presented sufficient evidence to the grand jury to find probable cause that the artifacts were "property of another." When taken as a whole, the evidence submitted to the grand jury was sufficient for "a person of ordinary caution or prudence to believe and conscientiously en-

tertain a strong suspicion" that the artifacts were "property of another." *See Ganal,* 81 Hawai'i at 367, 917 P.2d at 379. However, the ICA erred in stating that "only evidence that the property was not that of Taylor [was] required" to constitute "property of another." Finally, the ICA did not err in affirming the circuit court's holding that the state prosecution was not barred by HRS § 701–112.

**A. Taylor's indictment for theft was supported by probable cause**

■ It is undisputed that Taylor's indictment is facially valid because it alleged all essential elements of the charged offense, and Taylor does not argue that he was not informed of the "nature and cause of the accusation against him[.]" *See State v. Jendrusch,* 58 Haw. 279, 281, 567 P.2d 1242, 1244 (1977) (internal quotation marks and citation omitted); *State v. Stan's Contracting, Inc.,* 111 Hawai'i 17, 34, 137 P.3d 331, 348 (2006) (internal citation omitted). Instead, Taylor argues that the evidence presented to the grand jury was insufficient to support the theft charge [18] because "the only basis [the State] proffered to the grand jury for finding probable cause to find that the artifacts were 'property of another,' is legally impossible, since NAGPRA unambiguously divested the museums of any type of property interest in the artifacts upon their repatriation and reburial in Kanupa Cave." Taylor also argues that the State's theory that it has an interest in the artifacts pursuant to HRS chapter 6E is invalid because HRS chapter 6E is preempted by NAGPRA.

Both Taylor and the State discuss NAGPRA at length, and both assume that it governs the determination of who had "possession of or any other interest in" the artifacts when Taylor took them from the cave. However, at no point was the grand jury advised of the existence or provisions of

---

18. Although Taylor argues in his application that the indictment should be dismissed "due to insufficiency of the evidence before the grand jury[,]" Taylor did not explicitly make this argument to the circuit court. Nevertheless, the arguments he advanced to the circuit court, including his arguments that "no one had possession of the artifacts when [Taylor] took them from the cave" and that the State did not adduce evidence before the grand jury that a native Hawaiian organization had a property interest in the artifacts, are properly characterized as a sufficiency of the evidence argument.

NAGPRA,[19] or given any direct evidence about whether or how it applies here. Similarly, the parties vigorously dispute whether the State had an interest in the artifacts pursuant to HRS chapter 6E based upon the State's ownership of the land where the cave is located. However, although evidence of the State's ownership of the land was presented to the circuit court in connection with the motion to dismiss, the grand jury was presented with no evidence whatsoever regarding the ownership of the land.

Our task here is to determine whether the grand jury had sufficient evidence before it to infer probable cause that a violation of HRS § 708–830 took place, and not what, if this case were to go to trial, the evidence might show with regard to the identity of those with an interest in the property. Accordingly, although we briefly discuss NAGPRA and its potential applicability for background purposes, our decision is governed by the evidence that was in fact presented to the grand jury, and whether that evidence supported a finding of probable cause.

### 1. NAGPRA

█ NAGPRA was enacted on November 16, 1990, to "facilitate the return of Native American cultural items and remains to the tribes with whom those items are affiliated."[20] *Fallon Paiute–Shoshone Tribe v. U.S. Bureau of Land Mgmt.*, 455 F.Supp.2d 1207, 1217 (D.Nev.2006); *see* 25 U.S.C. § 3001 *et seq.* NAGPRA essentially functions as a "dual statute[.]" *Fallon Paiute–Shoshone Tribe*, 455 F.Supp.2d at 1217; *see*

25 U.S.C. § 3001 *et seq.* First, NAGPRA provides for the return of "cultural items that are excavated or discovered on Federal or tribal lands [21] after November 16, 1990[.]" 25 U.S.C. § 3002(a). Second, NAGPRA provides for the repatriation of human remains, funerary objects, sacred objects, and objects of cultural patrimony that are held by federal agencies, and museums or institutions that receive federal funding.[22] 25 U.S.C. § 3005.

In the instant case, it is undisputed that the Kanupa Cave artifacts were taken from the cave "in the late 1800s" by J.S. Emerson and were then repatriated in 2003. Therefore, although Taylor cites to NAGPRA's "ownership or control" provisions set forth in 25 U.S.C. § 3002(a)(1)-(2), involving artifacts excavated or discovered on Federal or tribal lands after November 16, 1990, it appears that those provisions are not directly applicable to the instant case. *See* 25 U.S.C. § 3002(a)(1)-(2) (providing for the "ownership or control of Native American cultural items which are excavated or discovered *on Federal or tribal lands after November 16, 1990* ") (emphasis added). Instead, assuming that the artifacts were in fact repatriated pursuant to NAGPRA, it appears that 25 U.S.C. §§ 3003, 3004 and 3005 are the provisions of NAGPRA that would directly apply.

25 U.S.C. § 3003 requires federal agencies and museums with "possession or control over holdings or collections of Native American *human remains and associated funerary objects* " to inventory such items and identify the cultural affiliation [23] between these ob-

---

**19.** The only law on which the grand jury was instructed was the applicable provisions of the Hawai'i Revised Statutes.

**20.** NAGPRA applies to both "Native American" and "Native Hawaiian" cultural items. *See* 25 U.S.C. § 3001 *et seq.* A "Native American" is defined as "of, or relating to, a tribe, people, or culture that is indigenous to the United States." 25 U.S.C. § 3001(9). A "Native Hawaiian" is defined as "any individual who is a descendant of the aboriginal people who, prior to 1778, occupied and exercised sovereignty in the area that now constitutes the State of Hawaii." 25 U.S.C. § 3001(10).

**21.** Relevant to the instant case, NAGPRA's definition of "tribal land" includes "any lands administered for the benefit of Native Hawaiians

pursuant to the Hawaiian Homes Commission Act, 1920, and section 4 of Public Law 86–3." 25 U.S.C. § 3001(15)(C). Neither party argues that Kanupa Cave is located on tribal land, as that term is defined in NAGPRA.

**22.** NAGPRA "does not apply to items found on private or state land," or "items held by museums that do not receive federal funds[.]" *State ex rel. Comm'r of Transp. v. Med. Bird Black Bear White Eagle*, 63 S.W.3d 734, 753 (Tenn.Ct.App. 2001) (citation omitted).

**23.** " '[C]ultural affiliation' means that there is a relationship of shared group identity which can be reasonably traced historically or prehistorically between a present day Indian tribe or Native Hawaiian organization and an identifiable earlier group." 25 U.S.C. § 3001(2).

jects and "present-day Indian tribes and Native Hawaiian organizations." 25 U.S.C. § 3003(a) (emphasis added); 43 C.F.R. § 10.9 (2003). 25 U.S.C. § 3004 requires agencies or museums with "holdings or collections of Native American *unassociated funerary objects, sacred objects, or objects of cultural patrimony*" to complete a summary of these items "in lieu of an object-by-object inventory[,]" and to describe the cultural affiliation of the collection "where readily ascertainable." 25 U.S.C. § 3004(a) (emphasis added); *see also* 43 C.F.R. § 10.8. In the instant case, the record does not establish whether the artifacts were within 25 U.S.C. §§ 3003 or 3004.[24]

25 U.S.C. § 3005(a) provides detailed requirements for the repatriation of "Native American human remains and objects possessed or controlled by Federal agencies and museums[.]"[25] *See also* 43 C.F.R. § 10.10. For example, pursuant to 25 U.S.C. § 3005(a)(1) and 43 C.F.R. § 10.10(b)(1), a federal agency or museum must "expeditiously" return human remains and associated funerary objects upon request by a lineal descendant, Indian tribe or native Hawaiian organization, where a cultural affiliation with

the tribe or organization has been established pursuant to 25 U.S.C. § 3003 and 43 C.F.R. § 10.10(b). Similarly, 25 U.S.C. § 3005(a)(2) and 43 C.F.R. § 10.10(a)(1) provide for the "expeditious[ ]" return of "unassociated funerary objects, sacred objects or objects of cultural patrimony" upon request by an Indian tribe or native Hawaiian organization, where a cultural affiliation with the tribe or organization has been shown pursuant to 25 U.S.C. § 3004 and 43 C.F.R. § 10.10(a)(1), and where the affiliated tribe or organization "presents evidence which ... would support a finding that the museum or Federal agency does not have a right of possession to the objects"[26] as required under 43 C.F.R. § 10.10(a)(1)(iii).

In sum, when remains or cultural objects held by a museum subject to NAGPRA are determined to be affiliated with a Native American tribe or native Hawaiian organization, the remains or cultural objects "are to be repatriated expeditiously upon request." *See Fallon Paiute–Shoshone Tribe*, 455 F.Supp.2d at 1218 (citing 25 U.S.C. § 3005(a) and 43 C.F.R. § 10.10(b)).[27] In addition, "[t]he return of cultural items covered by this chapter shall be in consultation with the

24. The dissent appears to conclude that the artifacts at issue in the instant case were classified as "sacred objects or objects of cultural patrimony" under NAGPRA. Dissenting opinion at 768. However, the record does not contain any evidence indicating how the artifacts were classified. Accordingly, we do not express an opinion on this issue.

25. In addition, 25 U.S.C. § 3005(a)(5) and 43 C.F.R. § 10.10(c) set forth several exceptions to the general requirements for repatriation.

26. "[R]ight of possession" is defined in 25 U.S.C. § 3001 as:

possession obtained with the voluntary consent of an individual or group that had authority of alienation. The original acquisition of a Native American unassociated funerary object, sacred object or object of cultural patrimony from an Indian tribe or Native Hawaiian organization with the voluntary consent of an individual or group with authority to alienate such object is deemed to give right of possession of that object, unless the phrase so defined would, as applied in section 3005(c) of this title, result in a Fifth Amendment taking by the United States as determined by the United States Court of Federal Claims pursuant to 28 U.S.C. 1491 in which event the "right of pos-

session" shall be as provided under otherwise applicable property law. The original acquisition of Native American human remains and associated funerary objects which were excavated, exhumed, or otherwise obtained with full knowledge and consent of the next of kin or the official governing body of the appropriate culturally affiliated Indian tribe or Native Hawaiian organization is deemed to give right of possession to those remains.

25 U.S.C. § 3001(13).

The regulations similarly define "[r]ight of possession" with regard to unassociated funerary object, sacred object or object of cultural patrimony, but do not extend this definition to human remains or associated funerary objects. 43 C.F.R. § 10.10(a)(2). In the instant case, it is undisputed that J.S. Emerson "took" the artifacts from Kanupa Cave and there is no evidence to suggest that he obtained the consent of an individual or group that had authority of alienation.

27. Although *Fallon Paiute–Shoshone Tribe* solely concerned "remains," 455 F.Supp.2d at 1218, as noted herein, funerary objects, sacred objects, and objects of cultural patrimony that are subject to NAGPRA also must be expeditiously repatriated upon a showing of cultural affiliation. 25 U.S.C. § 2005(a)(1)(2); 43 C.F.R. § 10.10.

requesting lineal descendant or tribe or organization to determine the place and manner of delivery of such items." 25 U.S.C. § 3005(a)(3); *see also* 43 C.F.R. § 10.10(d). Moreover, with regard to unassociated funerary objects, sacred objects, and objects of cultural patrimony, a museum must generally return the objects upon request "unless it can ... prove that it has a right of possession to the objects." 25 U.S.C. § 3005(c); *see also* 43 C.F.R. § 10.10(a)(iii)-(iv).

In the instant case, the State did not provide evidence to the grand jury regarding whether a cultural affiliation between the Kanupa Cave artifacts and a native Hawaiian organization had been established pursuant to 25 U.S.C. §§ 3003 or 3004. However, assuming that the Kanupa Cave artifacts were repatriated pursuant to NAGPRA as Taylor suggests, the artifacts would have been repatriated to a culturally affiliated organization or to a lineal descendant. *See* 25 U.S.C. § 3005(a). Accordingly, the individual or organization to whom the artifacts were repatriated would have had a right of possession in the artifacts at the time the artifacts were repatriated.

### 2. The State presented sufficient evidence to the grand jury to maintain Taylor's indictment

Taylor contends in his application that the State presented insufficient evidence to the grand jury regarding the "property of another" element of the offense. Specifically, Taylor argues that the State only presented evidence to the grand jury that the Bishop and Peabody Essex Museums previously owned the artifacts, and further argues that

the museums do not own the artifacts after repatriation.[28]

"A grand jury indictment must be based on probable cause." *Ganal*, 81 Hawai'i at 367, 917 P.2d at 379 (quotation marks and citations omitted). "Probable cause" has been defined as "a state of facts as would lead a person of ordinary caution or prudence to believe and conscientiously entertain a strong suspicion of the guilt of the accused." *Id.* (citation, internal quotation marks, and brackets omitted). Furthermore, in order to support an indictment, the prosecution must provide evidence of each essential element of the charged offense to the grand jury. *Ontai*, 84 Hawai'i at 63–64, 929 P.2d at 76–77. "If no evidence is produced as to a material element of the offense, a person of ordinary caution and prudence could not have a 'strong suspicion' that the defendant is guilty of the [charged] crime." *Id.* at 64, 929 P.2d at 77.

Therefore, in order for the grand jury to have found probable cause to support Taylor's indictment for first degree theft, the State must have produced evidence of each essential element of the offense. *See Ontai*, 84 Hawai'i at 64, 929 P.2d at 77. This court has held that there are three material elements for theft in the first degree under HRS §§ 708–830(1) and 708–830.5(1)(a): that "the defendant intended to: (1) obtain or exert control over the property of another; (2) deprive the other of his or her property; and (3) deprive another of property that exceeds $20,000 in value." *State v. Duncan*, 101 Hawai'i 269, 279, 67 P.3d 768, 778 (2003). HRS § 708–800 defines "[p]roperty of another" as "property which any person, other than the defendant, has possession of or any other interest in[.]"[29] *Id.* Because Taylor

28. In its answering brief, the State disputed Taylor's characterization of the theory it presented to the grand jury and argued that "it never relied on evidence that the artifacts were property of 'the museums that once cared for them' in order to prove particular ownership" and that "[t]he charging instrument was not, contrary to [Taylor's] suggestion, obtained under this theory." It appears that the State is correct, in that it did not explicitly identify *any* specific theory of ownership during its presentation to the grand jury.

29. Because the plain language of HRS § 708–800 mentions both "possession" and "any other

interest in" property, the statute appears to contemplate that multiple parties could have a concurrent or shared property interest in the property at issue. However, "other interest" is not defined in the Hawai'i Revised Statutes nor is it defined in the Model Penal Code, from which Hawai'i derived its definition of "property of another." Judicial Council of Hawai'i, Hawai'i Penal Code (Proposed Draft) at 356 (1970); *see* Model Penal Code and Commentaries article 223 (1962).

The State asserts that it "provided evidence of at least four named entities with a clear cut 'other interest' in the artifacts[,]" i.e., the State,

does not dispute that the State presented evidence satisfying the second and third elements for theft in the first degree, we focus on the first element—that Taylor obtained or exerted control over the property of another. *See id.* at 279, 67 P.3d at 778.

The following facts were presented to the grand jury through the testimony of Agent Kaikana: (1) in the 1800s, J.S. Emerson "took artifacts out of [Kanupa Cave,]" some of which he then sold to the Bishop Museum and the Peabody Essex Museum in Massachusetts; (2) those artifacts were "repatriated" from the museums and "reburied" at Kanupa Cave;[30] (3) "Hui Malama, ... OHA, [the] State, and the Bishop Museum .... all got together, brought the thing [sic] back to Kanupa and it was repatriated"; (4) Taylor, who owned a store in Captain Cook that sold antiquities, and an accomplice went to the cave "with the direction of some third party"; (5) Taylor and the accomplice "removed the rock that was blocking the cave entrance" and went inside; (6) there they found "a lot of artifacts or items that were in woven lauhala basket [sic] and wrapped in black cloth"; (7) they took about 157 artifacts from the cave and tried to sell them; (8) some of the artifacts bore "Emerson tags or [ ] labels"; (9) Taylor knew that the artifacts belonged to the J.S. Emerson Collection; (10) Taylor, "[t]o hide or conceal the sale of these items, [took] the Emerson tags off of the items, the artifacts, to sell [them]"; and (11) the estimated value of the artifacts was between $800,000 and $1.2 million.

Based on the foregoing evidence, "a person of ordinary caution or prudence" could "believe and conscientiously entertain a strong suspicion" that the artifacts were "property of another." *See Ganal,* 81 Hawai'i at 367, 917 P.2d at 379. Most notably, the grand jury heard evidence that artifacts were worth at least $800,000. It further heard evidence from which it could reasonably be inferred that the artifacts had been purposely secreted in the cave and not simply discarded, including the fact that the cave entrance had been covered with a rock, the items were enclosed in lauhala and black cloth, and reburial had been undertaken in a joint effort involving the State of Hawai'i, as well as "Hui Malama, ... OHA, ... and the Bishop Museum[.]"

Thus, the evidence before the grand jury did not suggest that the artifacts were abandoned.[31] If the artifacts were abandoned, they could not, by definition, be "property of another," and an indictment for first degree theft could not be maintained. Indeed, in his application Taylor analogizes his case to an environmentalist picking up a discarded soda can to recycle it or a small boy picking up a penny by the side of the road, and suggests that their conduct would be criminalized by the ICA's holding. However, those hypothetical cases are clearly distinguishable, since they did not involve property worth at least $800,000 which the evidence reasonably suggested had been carefully wrapped and secreted in a cave as part of a multi-party repatriation effort.

Hui Malama, OHA, and the Bishop Museum, and that NAGPRA does not "preclude those four groups from having an 'other interest' in the artifacts[.]" More specifically, the State argues that "[b]ecause Hui Malama and OHA (and perhaps Bishop Museum as well) have at least a cultural interest in the artifacts, [HRS] § 708–800's 'other interest' standard is easily satisfied." However, the State cites no authority for the position that an "other interest" encompasses a "cultural interest[.]" The State further argues that "the Bishop Museum and the State also have an 'other interest' in the artifacts because they, like Hui Malama and OHA, participated in the repatriation and reburial." Because we conclude that the State presented sufficient evidence to the grand jury to establish that someone other than Taylor had a possessory interest in the artifacts, we do not address the State's arguments

concerning "other" interests, and express no opinion with regard to their merits.

**30.** The grand jury was not provided with a definition of "repatriated"; however, it is commonly defined as "to restore or return to the country of origin, allegiance, or citizenship." Merriam–Webster's Collegiate Dictionary 1055 (11th ed.2009).

**31.** Abandoned property is generally defined as "that to which the owner has voluntarily relinquished all right, title, claim, and possession, with the intention of terminating his or her ownership, but without vesting ownership in any other person, and with the intention of not reclaiming any future rights therein." 1 Am.Jur.2d *Abandoned, Lost, and Unclaimed Property* § 3 (2005) (footnote omitted).

Nor did the evidence in the grand jury suggest that Taylor owned the items or that he had permission to take the artifacts. To the contrary, the evidence of Taylor's conduct after he took the items (removing the tags so that they would be more difficult to trace) supports the reasonable inference that he neither owned them nor had permission to take them.

Rather, the value of the items and the manner and circumstances in which they were reburied were sufficient to create a "strong suspicion" that someone other than Taylor retained a right of possession in the artifacts and that the items were accordingly the "property of another" when Taylor took them. It is true, as Taylor points out, that the evidence presented to the grand jury was not sufficient to establish exactly which entity or entities had a possessory or other interest in the artifacts.[32] However, our caselaw does not require that level of specificity in order to sustain an indictment. *See Ganal,* 81 Hawai'i at 367, 917 P.2d at 379 ("[T]he evidence to support an indictment need not be sufficient to support a conviction.").

This point is illustrated by our holding in *Nases,* where the defendant was charged with and convicted of theft of a calculator pursuant to HRS § 708–830. 65 Haw. at 218, 649 P.2d at 1139. On appeal, the defendant argued that there was a fatal variance between the charge and the evidence presented against him at trial. *Id.* The charged offense alleged that the calculator was the property of "Setsuko Yokoyama and Setsuko Yokoyama doing business as Kalakaua Kleaners, whereas it was actually the proper-

ty of Kalakaua Kleaners, a corporation." *Id.* This court held that it was "undisputed that the calculator did not belong to [the defendant] but was the property of another. The particular ownership of the property in question was not an essential element in proving the crime and there is no fatal variance between the charge and the proof." *Id.* at 218, 649 P.2d at 1139–40. Rather,

> [i]t has long been settled that where the offense is obtaining control over the property of another, proof that the property was the property of another is all that is necessary and the *naming of the person owning the property in the indictment is surplusage.*

*Id.* (emphasis added) (citations omitted).

Although the facts of *Nases* differ from the instant case in that *Nases* involved a variance between the indictment and the evidence presented at trial, *Nases* supports the proposition that the State need only prove that the property taken is that "of another." *Id.* Therefore, because the State presented sufficient evidence that the artifacts were "property of another," it was not required to present evidence to the grand jury establishing which entity or entities had a possessory interest in the artifacts.[33]

▮ However, the ICA erred when it stated that "specification of the actual owner of the property for purposes of this theft charge is not required *and only evidence that the property was not that of Taylor is required.*" *Taylor,* 2011 WL 661793, at *9 (emphasis added). As discussed *supra,* HRS § 708–800 defines "property of another" in HRS § 708–830(1) as "property which any

---

**32.** Accordingly, we respectfully disagree with the dissent's assertion that Agent Kaikana's testimony "left the impression" that the artifacts belonged to the Bishop Museum or the Peabody Essex Museum. Dissenting opinion at 773–74. Agent Kaikana testified that J.S. Emerson "took artifacts out of that cave" and sold some of them to the Bishop Museum and Peabody Essex Museum, and that those artifacts were in turn "repatriated from both the Bishop Museum and the Peabody Essex [Museum]" and were "reburied" at Kanupa Cave by "Hui Malama, … OHA, [the] State, and the Bishop Museum." Inasmuch as Agent Kaikana testified that the artifacts were "eventually repatriated from both the Bishop Museum and the Peabody Essex [Museum]," his testimony did not "[leave] the impression" that

the artifacts continued to belong to either of the museums. Moreover, although Agent Kaikana testified that items recovered during the investigation in Taylor's case bore J.S. Emerson Collection labels and/or were part of the museums' collections, this testimony was relevant to prove that the items in Taylor's possession were the same items that had been removed from Kanupa Cave.

**33.** Accordingly, we respectfully disagree with the dissent's conclusion that the indictment could not be sustained absent "the presentation of facts supporting a property interest in a Native Hawaiian organization[.]" Dissenting opinion at 769; *see also* dissenting opinion at 775.

person, other than the defendant, has possession of or any other interest in[.]" "Property" is defined in HRS § 708–800 as "any money, personal property, real property, thing in action, evidence of debt or contract, or article of value of any kind." Consequently, as Taylor correctly contends, "something may well be 'property' (because it is an article of value of some kind) but not yet 'property of another' (because someone does not possess it or have any other interest in it)." Therefore, the ICA erred when it stated that "only evidence that the property was not that of Taylor is required." *Id.*

In sum, because the State presented evidence that "a person of ordinary caution or prudence" could "believe and conscientiously entertain a strong suspicion" that the artifacts were the "property of another," there was sufficient evidence to support Taylor's indictment, and the circuit court did not err in denying his motion to dismiss on this ground.

**B. The ICA did not err in affirming the circuit court's holding that the state prosecution was not barred by HRS § 701–112**

■■■ Taylor argues that "the ICA gravely erred in holding that [Taylor's] prior federal conviction did not bar the State's prosecution in this matter under HRS § 701–112," because the state prosecution required proof of the same facts as the federal prosecution. For the reasons set forth below, Taylor's argument is without merit.

> HRS § 701–112 provides in relevant part:
> When behavior constitutes an offense within the concurrent jurisdiction of this State and of the United States or another state, a prosecution in any such other jurisdiction is a bar to a subsequent prosecution in this State under any of the following circumstances:
> (1) The first prosecution resulted in an acquittal which has not subsequently been set aside or in a conviction as defined in section 701–110(3), and the subsequent prosecution is based on the same conduct, unless:
>> (a) *The offense for which the defendant is subsequently prosecuted requires proof of a fact not required by the former offense and the law defining each of the offenses is intended to prevent a substantially different harm or evil[.]*

(Emphasis added).

Thus, assuming arguendo that the theft and conspiracy offenses in the instant case were based on the same underlying conduct,[34] Taylor's theft prosecution was permissible under HRS § 701–112(1)(a) if (1) the theft offense required proof of facts not required for the conspiracy offense; and (2) the law defining each of the offenses is intended to prevent a substantially different harm or evil. *See* HRS § 701–112(1)(a).

This court has addressed HRS § 701–112 only once, in *State v. Myers,* 100 Hawai'i 132, 134, 58 P.3d 643, 645 (2002). However, *Myers* is inapposite because the sole issue considered by this court was "whether [a Uniform Code of Military Justice] Article 15 nonjudicial punishment is equivalent to a criminal 'conviction' as defined in HRS § 701–110(3)." *Id.* This court held that the Article 15 nonjudicial punishment was not equivalent to a conviction, as required under HRS § 701–112(1), and thus the court was not required to consider whether the exceptions set forth in HRS § 701–112(1)(a) applied. *Id.* at 137, 58 P.3d at 648. Thus, this court did not address the meaning of the phrases "proof of a fact not required by the former offense" and "substantially different harm or evil," and therefore there is no controlling authority on this point. *See id.*

**1. Proof of a fact not required**

■■■ In interpreting a statute, "where the statutory language is plain and unambiguous, our sole duty is to give effect to its plain and obvious meaning." *Awakuni v. Awana,* 115 Hawai'i 126, 133, 165 P.3d 1027, 1034 (2007)

---

34. While the State argued in the ICA and this court that the offenses were not based on the same underlying conduct, this issue was not raised in the circuit court. Because we conclude that the theft prosecution was permissible under the two-pronged exception set forth in HRS § 701–112(1)(a), we do not address this issue.

(citation omitted). The unambiguous language of HRS § 701–112(1)(a) states that a subsequent prosecution is permissible if, inter alia, the subsequent offense requires proof of some fact not required by the former offense. The drafters of the Hawaiʻi Penal Code noted that "it seems very unjust to permit the defendant to be prosecuted twice simply because of the fortuitous circumstance that the defendant's behavior constitutes an offense in more than one jurisdiction[,]" unless the requirements set forth in HRS § 701–112(1)(a) are met. HRS § 701–112 cmt. (1993).[35]

In the instant case, Taylor was charged in state court with theft in the first degree. HRS § 708–830.5(1)(a) provides that "[a] person commits the offense of theft in the first degree if the person commits theft . . . [o]f property or services, the value of which exceeds $20,000[.]" HRS § 708–830(1) further provides that "[a] person commits theft if the person . . . obtains or exerts unauthorized control over the property of another with intent to deprive the other of the property." As noted *supra*, this court explained in *Duncan* that there are three material elements for theft in the first degree: that "the defendant intended to: (1) obtain or exert control over the property of another; (2) deprive the other of his or her property; and (3) deprive another of property that exceeds $20,000 in value." 101 Hawaiʻi at 279, 67 P.3d at 778.

In contrast, in his federal prosecution, Taylor pled guilty to conspiracy under 18 U.S.C. § 371 to commit trafficking under 18 U.S.C. § 1170(b). 18 U.S.C. § 371 (1994) defines conspiracy, in relevant part, as follows:

> If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or

any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both.

18 U.S.C. § 1170(b) defines the trafficking crime as:

> Whoever knowingly sells, purchases, uses for profit, or transports for sale or profit any Native American cultural items obtained in violation of [NAGPRA] shall be fined in accordance with this title, imprisoned not more than one year, or both, and in the case of a second or subsequent violation, be fined in accordance with this title, imprisoned not more than 5 years, or both.

Therefore, in order to prove Taylor's conspiracy offense, the federal government was required to prove that (1) Taylor and one or more persons conspired to commit an offense against the United States; (2) the offense involved the knowing sale, purchase, use for profit, or transport for sale or profit of items; (3) the items were Native American cultural items; (4) the items were or would be obtained in violation of NAGPRA; and (5) Taylor and/or one of his co-conspirators committed an act in furtherance of the conspiracy. *See* 18 U.S.C. §§ 371 and 1170(b).

Thus, Taylor's federal prosecution, unlike his state prosecution, did not require proof of facts that the property involved had a value in excess of $20,000. *Compare* 18 U.S.C. §§ 371 and 1170(b) *with* HRS §§ 708–830(1) and 708–830.5(1)(a). The value element of the first degree theft offense is an additional fact required by HRS § 701–112.[36] Therefore, the ICA correctly concluded that the state theft offense requires proof of a value element, which the federal conspiracy offense does not.[37]

---

**35.** Although the commentary accompanying the Hawaiʻi Penal Code "may be used as an aid in understanding the provisions of [the] Code," it is "not [] evidence of legislative intent." HRS § 701–105 (1993).

**36.** Taylor argues that HRS § 701–112(1)(a) does not set forth a "same elements" test, but rather requires a more fact-specific approach. However, even assuming arguendo HRS § 701–112(1)(a) does not set forth a "same elements"

test, Taylor's argument fails because Taylor's prosecution for theft in state court requires proof of facts not required by his federal conspiracy conviction, i.e., that the property involved had a value in excess of $20,000.

**37.** Since the requirement that the property involved have a value in excess of $20,000 clearly satisfies the requirement set forth in HRS § 701–112(1)(a) that the subsequent prosecution involve "proof of a fact not required by the former of-

■ Nevertheless, Taylor argues that HRS § 701–112(1)(a) precludes the theft charge because all the facts required to convict under HRS §§ 708–830(1) and 708–830.5(1)(a) are admitted to in his plea agreement.[38] For example, Taylor argues that "[t]he factual basis for [his] guilty plea in the federal case also included the facts that he attempted to sell one artifact for $40,000 and another for $5,600, and actually did sell two others for $150 and $2,083." Although Taylor's federal plea agreement mentions the prices at which Taylor attempted to sell and did sell several items, neither 18 U.S.C. § 371 nor 18 U.S.C. § 1170(b) has a value requirement, and thus such facts were unnecessary to Taylor's conviction. The values listed in Taylor's federal plea agreement did not become required elements of his conspiracy offense merely by their placement in the plea agreement.

## 2. Substantially different harm or evil

■ Additionally, HRS § 701–112(1)(a) requires the former and subsequent offenses be intended to prevent substantially different harms or evils. Taylor does not challenge the ICA's conclusion that HRS §§ 708–830(1) and 708–830.5(1)(a) and 18 U.S.C. §§ 371 and 1170(b) are intended to prevent substantially different harms or evils. Moreover, any such argument is without merit.

■ In determining the harm or evil a statute is intended to prevent, this court looks primarily to the language of the statute. *See, e.g., State v. Rapozo,* 123 Hawai'i 329, 338, 235 P.3d 325, 334 (2010) ("HRS § 702–236 further requires consideration of 'the harm or evil sought to be prevented by

the law defining the offense[.]' As with all efforts to determine legislative intent, that inquiry relies primarily on the plain language of the statute.") (brackets in original) (citations omitted); *State v. Kupihea,* 98 Hawai'i 196, 206, 46 P.3d 498, 508 (2002) (citation omitted) (noting that legislative intent is "obtained primarily from the language of the statute"). This court has explained that the purpose of Hawai'i's theft statute is to "protect[ ] owners from the deprivation of their property[.]" *State v. Freeman,* 70 Haw. 434, 439, 774 P.2d 888, 892 (1989).

As noted by the ICA, the United States Supreme Court has identified the harm or evil intended to be prevented by 18 U.S.C. § 371, concerning conspiracy, as follows:

It is well settled that the law of conspiracy serves ends different from, and complementary to, those served by criminal prohibitions of the substantive offense. Because of this, consecutive sentences may be imposed for the conspiracy and for the underlying crime. Our decisions have identified two independent values served by the law of conspiracy. The first is protection of society from the dangers of concerted criminal activity....

The second aspect is that conspiracy is an inchoate crime. This is to say, that, although the law generally makes criminal only antisocial conduct, at some point in the continuum between preparation and consummation, the likelihood of a commission of an act is sufficiently great and the criminal intent sufficiently well formed to justify the intervention of the criminal law. The law of conspiracy identifies the agreement to engage in a criminal venture as an

---

fense[,]" we do not address whether the element of "intent to deprive" was required in both the federal and state prosecutions, although this element was raised and discussed by the ICA. *See Taylor,* 2011 WL 661793, at *3.

**38.** In support of this assertion, Taylor cites *Yates v. United States,* 354 U.S. 298, 312, 77 S.Ct. 1064, 1 L.Ed.2d 1356 (1957), *overruled on other grounds by Burks v. United States,* 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978), for the proposition that "[i]n pleading guilty, [Taylor] admitted to numerous overt acts and thus, much like a general verdict, each of those facts predicated and were required by his federal conviction." However, *Yates* is inapposite because it consid-

ered alternative theories of guilt offered in support of a single charge. *Id.* There, the Court noted that a verdict must be set aside "in cases where the verdict is supportable on one ground, but not on another, and it is impossible to tell which ground the jury selected." *Id.* (citations omitted). Accordingly, *Yates* stands for the proposition that, where the jury returns a general verdict, a conviction will not stand unless each theory of guilt offered is supported by the evidence. *See id.* It does not, as Taylor argues, stand for the proposition that all of the facts Taylor pled to were "required" for his federal conviction, as that term is used in HRS § 701–112(1)(a).

event of sufficient threat to social order to permit the imposition of criminal sanctions for the agreement alone, plus an overt act in pursuit of it, regardless of whether the crime agreed upon actually is committed. *United States v. Feola*, 420 U.S. 671, 693–94, 95 S.Ct. 1255, 43 L.Ed.2d 541 (1975) (citations omitted).

Applying the rationale of *Feola* here, the state theft offense with which Taylor was charged addresses a harm or evil (the deprivation of property rights) different from that addressed by the federal conspiracy statute, which addresses the threat posed by agreements to commit criminal conduct.

Moreover, the purpose of NAGPRA has been articulated by the federal courts as follows:

The primary purpose of NAGPRA, which is to assist Native Americans in the repatriation of items that the tribes consider sacred, differs from that of the Antiquities Act, which is directed against the unlawful taking or destruction of property. Because the intended purposes of the two acts differ significantly, they should not be treated similarly for sentencing calculations.

*United States v. Corrow*, 941 F.Supp. 1553, 1567 (D.N.M.1996), *aff'd*, 119 F.3d 796 (10th Cir.1997).

Accordingly, NAGPRA and the state theft statutes were intended to prevent substantially different harms or evils, because the protection of graves and cultural items that is the purpose of NAGPRA and the protection from the deprivation of property that is the purpose of Hawai'i's theft statute, constitute substantially different interests. While both statutes involve a deprivation of some interest, the theft statute seeks to protect general property interests, while NAGPRA protects a very specific interest in Native American cultural items and graves. Moreover, NAGPRA contains a savings provision

that expressly states that the statute is in no way intended to interfere with either state or federal theft law. 25 U.S.C. § 3009(5) ("Nothing in this chapter shall be construed to ... limit the application of any State or Federal law pertaining to theft or stolen property.").

Therefore, the ICA correctly held that Taylor's theft offense required proof of facts which his federal conspiracy offense did not, and was designed to prevent a substantially different harm. Accordingly, Taylor's prosecution in state court is not barred under HRS § 701–112 and the circuit court did not err in denying Taylor's motion to dismiss in this respect.[39]

## IV. Conclusion

Although the ICA erred in stating that "only evidence that the property was not that of Taylor [was] required" to establish that the artifacts were the "property of another," we hold that the State nonetheless presented sufficient evidence to the grand jury to find probable cause that the property taken was "property of another." We further hold that Taylor's prosecution in state court is not barred by HRS § 701–112 because the theft charge requires proof of a fact not required for his federal conspiracy offense, and the purposes behind the state and federal statutes differ. Accordingly, we affirm the judgment of the ICA, which, as corrected by this opinion,[40] affirmed the circuit court's November 14, 2007 order denying Taylor's motion to dismiss the indictment.

Concurring & Dissenting Opinion by ACOBA, J.

I respectfully dissent[1] in that the evidence presented to the grand jury was insufficient to indict Petitioner/Defendant–Appellant Daniel Taylor (Petitioner) for theft in the first degree, Hawai'i Revised Statutes (HRS)

---

**39.** In the ICA, Taylor similarly argued that his state prosecution was barred by article I, section 10 of the Hawai'i Constitution, concerning double jeopardy. The ICA rejected this argument, and Taylor does not challenge this holding in his application. Accordingly, we need not address this issue. *See* Hawai'i Rules of Appellate Procedure (HRAP) Rule 40.1(d)(1).

**40.** *See* supra n. 2.

**1.** I agree with the majority that Petitioner's State prosecution was not barred, and, thus, I do not address Petitioner's argument in that respect.

§§ 708–830(1) (1993)[2] and 708–830.5(1)(a) (1993),[3] and the evidence that was presented was seemingly misleading. Accordingly, I would reverse the March 16, 2011 judgment of the Intermediate Court of Appeals (ICA), and the November 14, 2007 findings of fact, conclusions of law, and order denying Petitioner's motion to dismiss the indictment filed by the circuit court of the first circuit (the court), and remand for dismissal of the indictment without prejudice for lack of probable cause.

## I.

It is well established that a defendant has a "substantial constitutional right to a fair and impartial grand jury proceeding[,]" *State v. Joao*, 53 Haw. 226, 228–30, 491 P.2d 1089, 1091–92 (1971), and "due process of law[,] as guaranteed by ... [a]rticle I, [s]ections 4[[4]] and 8[[5]] to the Hawai'i Constitution[,]" *State v. Pulawa*, 62 Haw. 209, 211, 614 P.2d 373, 375 (1980). Indeed, there is a "constitutional necessity for grand jury action prior to prosecution for felonies[.]" *State v. Tominaga*, 45 Haw. 604, 611, 372 P.2d 356, 360 (1962). *See Territory v. Goto*, 27 Haw. 65, 1923 WL 2749, at *19 (1923) (noting that "[n]o person shall be held to answer for a capital or otherwise infamous crime unless on a presentment or indictment of a grand jury") (internal quotation marks and citation omitted).

"[T]he grand jury plays an important, constitutionally mandated role" in "[f]air and effective law enforcement" inasmuch as "its task is to inquire into the [e]xistence of possible criminal conduct and to return only well-founded indictments[.]" *Branzburg v. Hayes*, 408 U.S. 665, 687–88, 690, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972); *see Costello v. United States*, 350 U.S. 359, 362, 76 S.Ct. 406, 100 L.Ed. 397 (1956) (noting that the "basic purpose" of a grand jury is to "provide a fair method for instituting criminal proceedings against persons believed to have committed crimes").

The grand jury must carry out its constitutionally mandated role by returning an indictment only upon finding probable cause for the charge therein. *State v. Ganal*, 81 Hawai'i 358, 367, 917 P.2d 370, 379 (1996). "Probable cause is established by 'a state of facts as would lead a person of ordinary caution or prudence to believe and conscientiously entertain a strong suspicion of the guilt of the accused.'" *State v. Ontai*, 84 Hawai'i 56, 63, 929 P.2d 69, 76 (1996) (quoting *State v. Chung*, 75 Haw. 398, 409–10, 862 P.2d 1063, 1070 (1993)); *see State v. Freedle*, 1 Haw.App. 396, 400, 620 P.2d 740, 743 (1980) (noting that "the facts [must be] such as would lead a [person] of reasonable caution or prudence to believe and conscientiously

**2.** HRS § 708–830(1) provides that "[a] person commits theft" if the person "[o]btains or exerts unauthorized control over property. A person obtains or exerts unauthorized control over *the property of another with intent to deprive the other of the property.*" (Emphasis added.)

**3.** HRS § 708–830.5(1)(a) provides that "[a] person commits the offense of theft in the first degree if the person commits theft ... [o]f property or services, the value of which exceeds $20,-000[.]"

**4.** As related in *Pulawa*, "[t]his section is now identified in the amended Hawai'i Constitution as [a]rticle I, [s]ection 5, Due Process and Equal Protection." *Pulawa*, 62 Haw. at 211 n. 4, 614 P.2d at 375 n. 4. Article 1, section 5 of the Hawai'i Constitution provides that "No person shall be deprived of life, liberty or property without due process of law, nor be denied the equal protection of the laws, nor be denied the enjoyment of the person's civil rights or be discriminated against in the exercise thereof because of race, religion, sex or ancestry."

**5.** As related in *Pulawa*, "[t]his section is now identified in the amended Hawai'i Constitution as [a]rticle I, [s]ection 10, Indictment, Double Jeopardy, Self-incrimination." *Pulawa*, 62 Haw. at 211 n. 5, 614 P.2d at 375 n. 4. Article I section 10 provides in pertinent part that "[n]o *person shall be held to answer for a capital or otherwise infamous crime,* unless on a presentment or *indictment of a grand jury* or upon a finding of probable cause after a preliminary hearing held as provided by law or upon information in writing signed by a legal prosecuting officer under conditions and in accordance with procedures that the legislature may provide[.]" (Emphases added.) Article 1, section 10 was amended in 2002 "to permit prosecutors and the attorney general to initiate felony criminal charges by filing a written information signed by the prosecutor or the attorney general setting forth the charge in accordance with procedures and conditions to be provided by the state legislature." *Watland v. Lingle*, 104 Hawai'i 128, 130, 85 P.3d 1079, 1081 (2004) (quoting S.B. No. 996, H.D. 1, C.D. 1).

entertain a strong suspicion of guilt of the accused"). Thus, "[t]o meet the grand jury requirement of article I, section 10, an indictment must be specific enough to ensure that the grand jury had before it all the facts necessary to find probable cause." *State v. Israel*, 78 Hawai'i 66, 72–73, 890 P.2d 303, 309–10 (1995).

Based on the foregoing, a grand jury's weighty role is to determine whether criminal proceedings should begin. Correlatively, the grand jury's role is also to protect an individual from unwarranted or unfounded prosecution, when probable cause is lacking. *See State v. Bell*, 60 Haw. 241, 242–43, 589 P.2d 517, 519 (1978), *overruled on other grounds by State v. Chong*, 86 Hawai'i 282, 949 P.2d 122 (1997) (noting that "the grand jury's responsibilities include ... the determination of whether there is probable cause to believe that a crime has been committed[,]" and stating that the grand jury is responsible for "the protection of citizens against unfounded criminal prosecutions"); *see also Chong*, 86 Hawai'i at 289, 949 P.2d at 129 (stating that the "function of a grand jury [is] to protect against unwarranted prosecution") (quoting *Bell*, 60 Haw. at 256–57, 589 P.2d at 526 (Kidwell, J., concurring)).

Additionally, as noted, the grand jury must be fair and impartial in performing its duties. *See Joao*, 53 Haw. at 230, 491 P.2d at 1092 (noting that a defendant has a constitutional right to a fair and impartial grand jury proceeding). If the grand jury is presented with misleading evidence, an individual may be wrongly charged and prosecuted. *See State v. Wong*, 97 Hawai'i 512, 527, 40 P.3d 914,

929 (2002) (determining that dismissal of the indictment with prejudice was necessary when the grand jury was misled by the evidence presented by the prosecution, which prevented it "from operating with fairness and impartiality"). The grand jury cannot be fair or impartial when presented with misleading evidence. In this case it is plain for the reasons stated *infra* that the evidence was insufficient to find probable cause under article I, section 10, and that the evidence was seemingly misleading, violating Petitioner's constitutional right to a fair and impartial grand jury proceeding.

## II.

On June 17, 2004, Petitioner removed 157 artifacts from Kanupa Cave, and subsequently attempted to sell the artifacts.

On March 24, 2006, the United States government charged Petitioner with conspiring, in violation of 18 U.S.C. § 371, to violate 18 U.S.C. § 1170(B), which prohibits the selling, purchasing, or using for profit or transporting for sale or profit any native American cultural item obtained in violation of the Native American Graves Protection and Repatriation Act ("NAGPRA").[6] That charge alleged that "because many of the artifacts contained labels," Petitioner "knew the artifacts had either *belonged* to the J.S. Emerson Collection or had been cared for by a museum[.]" (Emphasis added.) On that day, March 24, Petitioner pled guilty.

Pursuant to the plea agreement, Petitioner acknowledged that the artifacts "contained

---

**6.** The United States Congress enacted NAGPRA, in pertinent part, to "repatriate Native American human remains, associated funerary objects, sacred objects, and objects of cultural patrimony currently held or controlled by Federal agencies and museums." *United States v. Corrow*, 119 F.3d 796, 800 (10th Cir.1997). "NAGPRA ... provides for an administrative process under which the agency [or museum] will decide to whom remains should be repatriated." *Na Iwi O Na Kupuna O Mokapu v. Dalton*, 894 F.Supp. 1397, 1405 (D.Haw.1995). As to remains and associated funerary objects, upon the request of a Native Hawaiian organization, a federally-funded museum must expeditiously repatriate those remains and/or items when, *inter alia*, the "affiliation" of the deceased individual and/or items to the Native Hawaiian organization has been

shown. 43 C.F.R. § 10.10(b). As to unassociated funerary objects, sacred objects, and objects of cultural patrimony, upon the request of a Native Hawaiian organization, a museum must expeditiously repatriate those items when, *inter alia*, the "cultural affiliation" of the object is established, and the Native Hawaiian organization "presents evidence which, if standing alone before the introduction of evidence to the contrary, would support a finding that the museum ... does not have a right of possession to the objects[,]" and the museum is unable to present evidence proving that it does have a right of possession. 43 C.F.R. § 10.10(a). Within 90 days of receipt of a written request from a Native Hawaiian Organization seeking repatriation, "[r]epatriation must take place [.]" 43 C.F.R. § 10.10.

labels indicating they belonged to the J.S. Emerson Collection, which was a collection of artifacts taken from Kanupa [C]ave in the late 1800s and sold to museums[.]" In the plea agreement, Petitioner agreed that he "knew the artifacts *belonged* to the J.S. Emerson Collection[,]" and "[t]o conceal the fact that some of the artifacts belonged to a well-known collection, [Petitioner] *removed the J.S. Emerson labels* from these artifacts." (Emphases added.) The contents of the plea agreement, although known to Respondent/Plaintiff–Appellee (Respondent or the State), were not divulged to the grand jury except by some general references, as noted *infra.*

### III.

On May 23, 2007, Respondent sought a grand jury indictment against Petitioner for theft in the first degree as indicated *supra,* based on his removal of the artifacts from the cave approximately three years before. The sole witness before the grand jury was Abraham Kaikana (Kaikana), a special agent with the Office of the Attorney General.

### A.

Before the grand jury, Kaikana testified that he was assigned to follow-up on an investigation of "theft of Hawaiian artifacts" from Kanupa Cave. Kaikana was asked if he could "describe" the "significance" of Kanupa Cave with respect to the "Hawaiian artifacts that are a part of the J.S. Emerson [C]ollection[.]" Kaikana explained that Joseph Swift Emerson (hereinafter J.S. Emerson or Emerson), a surveyor, collected artifacts from Kanupa Cave in the 1800s and sold some of the artifacts to the Bishop Museum and Peabody Museum in Massachusetts. The prosecution asked Kaikana if some of the artifacts were "repatriated from both the Bishop Museum and the Peabody Essex" Museum, to which Kaikana responded, "Yes, they were." Kaikana had reviewed the plea agreement that was filed in federal court, which "discussed some of the facts relating to the theft[.]" When asked to describe the "facts" that were presented in that plea agreement, Kaikana responded that the plea agreement "said" Petitioner entered the cave, where he "saw" 157 artifacts.

Kaikana testified that the artifacts had "Emerson tags o[n] their labels[,]" "indicating that they were *from the collection* [.]" (Emphasis added.) When asked whether the artifacts containing Emerson labels indicated "that they were *from the [Emerson C]ollection* [,]" Kaikana responded, "Yes[,]" and explained that Emerson placed labels on the items to document them. (Emphasis added.) When queried if Petitioner "knew that these items *belonged to the Emerson [C]ollection* [,]" Kaikana responded, "Yes, he did[; h]e saw Emerson tags on the items when he went into the cave." (Emphasis added.)

Kaikana confirmed that Petitioner had acknowledged, in Petitioner's plea agreement, that Petitioner knew the items belonged to the Emerson Collection, and Kaikana confirmed that specific items removed by Petitioner were part of the Emerson Collection. When asked whether items "appeared to have been *from the Emerson Collection* [,]" he responded in the affirmative. (Emphasis added.) He repeatedly confirmed that the artifacts "had Emerson labels[,]" making them "part of the Peabody Collection[.]" Some of the items had "Bishop Museum labels." Kaikana explained that two items Petitioner took from the cave were appraised at $500,000 to $750,000; three other items were appraised at $300,000 to $450,000; in total, the value of the items obtained from the cave was estimated to be in the range of $800,000 to $2,000,000.

At the end of his testimony, a grand juror asked whether there was documentation as to when the artifacts "went back into the cave[.]" Kaikana responded,

Yes, it's documented. *Hui Malama was part of that, [the Office of Hawaiian Affairs (OHA)], [the] State, and the Bishop Museum.* When it came back from, uh, Peabody, uh, Museum and Bishop Museum, they all got together, brought the thing back to Kanupa and it was repatriated, reburied it, the beginning of 2000[or] 2003[.]

(Emphasis added.)

### B.

Subsequently, the grand jury began deliberations. Three minutes after commencing,

it returned, issuing an indictment stating that, in violation of HRS §§ 708–830(1) and 708–830.5(1)(a), on June 17, 2004, Petitioner "obtain[ed] or exert[ed] unauthorized control over the property of another, to wit[,] artifacts from Kanupa Cave, having a value which exceeds [$20,000], with intent to deprive the other of the property, thereby committing the offense of Theft in the First Degree[.]" HRS § 708–800 (1993) defines "[p]roperty of another" in pertinent part as "property which *any person, other than the defendant, has possession of or any other interest in,* even though that possession or interest is unlawful[.]" (Emphasis added.)

### C.

On July 24, 2007, Petitioner filed a motion to dismiss the indictment (Petitioner's motion), arguing, in pertinent part, that "evidence that the State adduced before the grand jury" was insufficient, as a matter of law, to indicate the artifacts were the "property of another[.]" (Citing HRS § 708–800.) Respondent opposed the motion, arguing that it was "only required to prove that the property belonged to another [other] than [Petitioner]."

On August 30, 2007, the court held a hearing on Petitioner's motion and asked the parties for supplemental briefing on whether HRS chapter 6E indicated that the State owned the artifacts. As requested, on September 12, 2007, Respondent submitted a supplemental memorandum arguing that because Kanupa Cave is located on State property, pursuant to HRS § 6E–7 (1993),[7] the artifacts were "historic property" and, thus, the property of "another," i.e., the State.[8]

On September 13, 2007, Petitioner submitted a supplemental memorandum in support of his motion arguing in pertinent part that the artifacts were not the property of another inasmuch as no person had "possession" of, or "any other interest" in, them. (Quoting HRS § 708–800.) According to Petitioner, the State's "interest in the artifacts is solely to 'preserve' them for 'proper disposi-

tion' to the lineal or cultural descendants of the people with whom the artifacts were interred[,]" which would not suffice as an "interest" under HRS § 708–800. In Petitioner's view, even if a Native Hawaiian organization had ownership rights in the property under NAGPRA, "the indictment must still be dismissed because the State did not present evidence that such an organization was the owner of the artifacts during the grand jury proceedings." (Quoting HRS § 6E–7.)

On October 5, 2007, the court denied Petitioner's motion, and on November 14, 2007, issued findings of fact, conclusions of law, and an order, concluding that the State had indicated it had a property interest in the artifacts pursuant to HRS § 6E–7:

**Conclusions of law**

. . . .

15. The indictment in the [S]tate theft cases alleges, *inter alia,* that [Petitioner] "would obtain or exert unauthorized control over the property of another. . . ." [Petitioner] alleges that the property belongs to no one. *[Respondent] alleges that it has a property interest in the property due to [HRS 6E–7] which states[,] "All historic property located on lands or under waters owned or controlled by the State shall be the property of the State."*

16. The statutory definitions in [HRS] § 708–800, [ ] of the terms, "control over property", "obtain", "property of another", and "unauthorized control over property" leads to the conclusion, as held in [*Nases,* 65 Haw. at 218, 649 P.2d at 1139,] that "where the offense is obtaining control over the property of another, proof that the property was the property of another is all that is necessary and the naming of the person owning the property in the indictment is surplusage." In other words, the elements, "unauthorized control of the property of another" of theft, make it an offense for a person to exert control over property when he is not authorized by the

---

7. HRS § 6E–7(a) provides in pertinent part that "[a]ll historic property located on lands or under waters owned or controlled by the State shall be the property of the State."

8. Respondent maintained that, "for the purpose of this prosecution, the State would argue that the stolen Hawaiian artifacts are the property of another, the State[.]"

person who has possession of or any other interest in the same property. (Emphasis added.) The court did not, however, specifically address under HRS § 708–830(1) who the "another" was in the instant case. It stated only, as discussed *infra*, the statutory definition of "another" and *noted that Respondent identified itself as having a property interest* in the artifacts.

## IV.

On December 13, 2007, Petitioner filed, and the court granted, a motion for an interlocutory appeal pursuant to HRS § 641–17 (Supp.2007).[9] On appeal to the ICA, Petitioner argued that there was insufficient evidence to support the indictment inasmuch as the evidence presented to the grand jury indicated the artifacts were the "property" of the Bishop Estate and Peabody Essex museums, but "neither museum possessed the artifacts or retained *any* sort of property interest in them after they were repatriated[.]" (Emphasis in original.) According to Petitioner, "[s]ince the State obtained its indictment on a theory—the artifacts were property of another because they were part of the Emerson Collection that "belonged to' the Bishop and Peabody museums—that is legally impossible, the indictment must be dismissed."

Without responding to Petitioner's argument that the evidence was insufficient to support the indictment, Respondent countered that the indictment was not facially defective [10] and that Petitioner's inability to "claim ownership" in the property was "important for prosecutorial purposes." According to Respondent, the State owned Kanupa Cave, and, thus, had a "legitimate *possessory interest in the artifacts pursuant to HRS chapter 6E*." (Emphasis added.)

The ICA rejected Petitioner's argument, determining that "specification of the actual owner of the property for purposes of this theft charge is not required and *only evi-*

dence that the property was not that of [Petitioner] is required." State v. Taylor, No. 28904, 2011 WL 661793, at *9 (App. Feb. 23, 2011) (emphasis added). In the ICA's view, the evidence, which included that Petitioner "acknowledged in his Plea Agreement that he *knew* the items belonged to the Emerson Collection, he saw Emerson tags on the items, and he removed the Emerson tags[,]" *id.* (emphasis added), demonstrated that the "artifacts *once were possessed* by Emerson and the museums, and that the State, Hui Malama, OHA, and Bishop Museum participated in the repatriation and reburial at Kanupa Cave[,]" which was enough to show that Petitioner did not own the property. *Id.* (emphasis added).

## V.

Petitioner applied for a writ of certiorari, asking in pertinent part whether the ICA erred when it determined that the only evidence necessary was that the property was not that of Petitioner, and that there was sufficient evidence to support the indictment:

Does the State establish that an item is 'property of another' simply by proving that the defendant did not own it, or must the State prove something more to establish that an item is an article of value that someone other than the defendant possesses or has some other interest in and therefore within the statutory definition of property of another?

## VI.

In connection with his question, Petitioner contends, "[t]hat the artifacts were once a part of the Emerson Collection held by the Bishop and Peabody museums did not provide probable cause to find that the artifacts were 'property of another' because, as a matter of law, neither museum retained any interest in the artifacts at the time [P]etitioner took them from Kanupa [C]ave."

---

9. HRS § 641–17 provides in pertinent part that, "[u]pon application made ... an appeal in a criminal matter may be allowed to a defendant from the circuit court to the intermediate appellate court, ... from a decision denying a motion to dismiss[.]"

10. Respondent argued that it was not required "to name the artifacts' actual owner in the charging document[,]" and that the indictment "contain[ed] the necessary charging information[.]"

Respondent opposes Petitioner's Application,[11] arguing in pertinent part that there "was more than sufficient evidence that others had a possessory or other interest in the artifacts" (citing HRS § 708–800), inasmuch as "*other entities (namely, the State, Hui Malama, OHA and Bishop Museum) had an interest in the artifacts.*" (Emphasis added.) According to Respondent's Opposition (Opposition), those four entities have a "clear cut 'other interest' in the artifacts[,]" inasmuch as they "participated in the repatriation and reburial [of the artifacts]." In its Opposition, Respondent contends that because Hui Malama, OHA, and perhaps Bishop Museum have "at least a *cultural interest* in the artifacts, HRS § 708–800's interest is easily satisfied." (Emphasis added.) Respondent also "clarif[ies]" that it "never asserted that it owns the artifacts[,]" but merely maintained that it has a "legally cognizable interest" in the artifacts *"for purposes of this prosecution."* (Emphasis in original.)

At oral argument before this court, it was unclear what interest was claimed. Respondent said that the four entities had an interest, but declined to state expressly what interest was held by those entities. Instead, Respondent maintained that the four entities "partly" had a cultural interest in the artifacts, but the interest in the artifacts was more "properly" characterized simply as "*an* interest" or "*any* interest." (Emphases added.) On the other hand, Respondent alternatively maintained that an interest "encompasses" a cultural interest.

## VII.

### A.

To reiterate, based on the evidence presented, the grand jury must have had "probable cause" that Petitioner committed theft in the first degree to return an indictment. Probable cause is established when "a state of facts" would lead a "person of ordinary

caution or prudence" to believe and "conscientiously entertain a strong suspicion" of guilt. *Ontai*, 84 Hawai'i at 63, 929 P.2d at 76. "Conscientious" is defined as "meticulous, careful[,] scrupulous[,]" *Merriam Webster's Collegiate Dictionary* 245 (10th ed.1993), and "Strong" is defined as, *inter alia*, "urgent, compelling[, i.e.,] grounds for believing him guilty[,]" *Webster's Third New Int'l Dictionary* 2265 (1993). Obviously, as the majority states, evidence "'support[ing] an indictment need not be sufficient to support a conviction[.]'" Majority opinion at 772–73 (quoting *Ganal*, 81 Hawai'i at 367, 917 P.2d at 379). However, under our law as ordinarily understood, the State must still present "a state of facts" that would lead a cautious person to meticulously, carefully, or scrupulously entertain an urgent or compelling suspicion that Petitioner committed theft in the first degree.

### B.

In order for the grand jury to have meticulously, carefully, or scrupulously entertained an urgent or compelling suspicion that Petitioner committed theft in the first degree, the State must have produced evidence of each essential element of the offense to the grand jury. *Ontai*, 84 Hawai'i at 64, 929 P.2d at 77. There are three material elements for theft in the first degree, that the defendant intended to "(1) obtain or exert control over the property of another; (2) deprive the other of his or her property; and (3) deprive another of property that exceeds $20,000 in value." *State v. Duncan*, 101 Hawai'i 269, 279, 67 P.3d 768, 778 (2003) (citation omitted).

In the context of the instant case, the dispute is whether the State produced evidence to the grand jury of the first element, that Petitioner obtained or exerted control over the property of another at the time he took the artifacts out of the cave. To determine whether the State submitted evidence

11. Respondent also argues that Petitioner did not assert in his briefs that the indictment should be dismissed because there was insufficient evidence to support probable cause that the artifacts were the property of another, but argued instead that, as a matter of law, the Kanupa Cave artifacts are not property of another. Respondent is

wrong. It is plain, as indicated *supra*, that Petitioner, in addition to arguing that the artifacts were not the property of the State or any Native Hawaiian organization, also argued that, even if they were, that evidence was not presented to the grand jury.

"that the property was the property of another" *at that point, Nases,* 65 Haw. at 218, 649 P.2d at 1139, this court must construe and apply the definition of "property of another" to ascertain whether any evidence submitted to the grand jury supported this element. As indicated before, "property of another" is defined in pertinent part as "property which any person, other than the *defendant, has possession of or any other interest in* [.]" HRS § 708-800 (emphasis added).

### 1.

Possession has been described in this jurisdiction as follows:

> "The law, in general, recognizes two kinds of possession: actual possession and constructive possession. A person who knowingly has *direct physical control* over a thing at a given time is then in actual possession of it. A person who, although not in actual possession, *knowingly has both the power and the intention at a given time to exercise dominion* over a thing, either directly or through another person or persons, is then in constructive possession of it."

*State v. Jenkins* 93 Hawai'i 87, 110, 997 P.2d 13, 36 (2000) (emphases added) (quoting *State v. Mundell,* 8 Haw.App. 610, 617, 822 P.2d 23, 27 (1991) (citing *Black's Law Dictionary* 1163 (6th ed.1990))); *see* Hawai'i Criminal Jury Instruction No. 6.06 (explaining actual and constructive possession, and noting that "[i]f two or more persons share actual or constructive possession of a thing, possession is joint"). As to "any other interest," HRS § 708-800 indicates that such interest must be a *"property"* interest. (Emphasis added.)

First, the construction of the words "any other interest" is subject to the rule of ejusdem generis. "The doctrine of ejusdem generis states that where general words follow specific words in a statute, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." *Singleton v. Liquor Comm'n,* 111 Hawai'i 234, 243 n. 14, 140 P.3d 1014, 1023 n. 14 (2006). "[A]ny other interest" is a general phrase following the specific term "property[.]" Accordingly, the general phrase "any other interest" must be construed "to embrace only objects similar in nature[,]" to property, the "object[ ] enumerated by the preceding specific words[.]" *Id.* "[A]ny other interest[,]" then, must relate to a property interest. Thus, the person must either have possession of, or any other *property* interest in, the property.

Second, reference to the Model Penal Code, which, according to the majority, was a basis for the definition of property of another found in HRS § 708-800, majority opinion at 753 n. 29, indicates that the interest must relate to a property interest. The Model Penal Code section 223.0(7) defines "property of another" to include "any *property* in which any person other than the defendant has an interest which the actor is not entitled to infringe[.]" (Emphasis added.) The *Model Penal Code and Commentaries* § 223.2 at 168 (Official Draft and Revised Comments 1980) (hereinafter MPC Commentary) explains that the foregoing definition includes "any ownership or possessory interest of another." The MPC Commentary confirms that the purported "interest" must be a property interest, inasmuch as it explains that the type of relationship between the "thief and the owner of property" is not material to determine whether the thief took property of another; contrastingly, it is material that the thief "sets out to appropriate a *property interest*" and the thief takes control over an "interest in property beyond any consent or authority given." *Id.* (emphases added).

Further elucidating that the interest must be a property interest, the MPC Commentary states that a person who has a property interest in property may be convicted of theft if that person unlawfully takes the property from another person who also has a property interest:

> There are some circumstances when a person ordinarily considered the owner of property may nevertheless be convicted of theft[.] This result follows from the provision in the definition of "property of another" that includes an interest in property held by another "regardless of the fact that the actor also has an interest in the property." *Thus, a partner may be convicted of theft of partnership property. Parties to joint bank accounts also may be*

convicted of stealing from each other by unauthorized withdrawals from the account. At common law, and still in some states, convictions were prevented by the conception that each joint owner had title to the whole of jointly owned property, so that one of the parties could not misappropriate what already belonged to him. *Whatever the merits of such notions in the civil law, it is clear that they have no relevance to the efforts of the criminal law to deter impairment of the economic interests of other people.* There was modern legislation in effect when the Model Penal Code was drafted that expanded the law of theft to reach such situations. *Moreover, a number of states have enacted or proposed a broad notion of "property of another" since the promulgation of the Model Code.*

*Id.* at 169–70 (footnotes omitted) (emphases added). Thus, inasmuch as it is "material" that the alleged thief takes control over an *"interest in property* [,]" and that an "owner" of property (i.e., someone who has a property interest) can be convicted of theft when he steals from another person who "may be considered the owner" (i.e., another person who has a property interest in property), the MPC Commentary confirms that the "interest" must be a property interest.

A construction of "any other interest" as anything other than a property interest would violate due process. "[A] basic principle of due process is that an enactment is void for vagueness if its prohibitions are not clearly defined[,]" *State v. Manzo,* 58 Haw. 440, 454, 573 P.2d 945, 954 (1977), and a criminal statute is required to be sufficiently definite as to give notice of the type of conduct prohibited so that a citizen may know how to avoid incurring its legal sanctions, *State v. Petrie,* 65 Haw. 174, 649 P.2d 381 (1982). A statute that does not give notice to a person of what conduct is prohibited is unduly vague and violates due process. If a person can be charged with theft when the person "obtain[s] or exert[s] control over[,]" 101 Hawai'i at 279, 67 P.3d at 778, property which a person has some "interest"

in, irrespective of the type of interest, as Respondent has at various times claimed, then it is unclear what conduct is prohibited.

### 2.

Based on the foregoing, and, pursuant to the definition of "property of another," Respondent had to present some evidence that a person had direct physical control over the artifacts (actual possession), or knowingly had both the power and the intention to exercise dominion over the artifacts (constructive possession), *at the time Petitioner took the items from Kanupa Cave or, at the time,* had a property interest in the artifacts such as to allow a cautious person to meticulously, carefully, or scrupulously entertain an urgent or compelling belief that the artifacts were the property of another. In the instant case, it is plain that there was *no evidence* presented to the grand jury that would enable a cautious person to entertain such a suspicion.

### VIII.

### A.

There was no evidence that any person had direct physical control over, or knowingly had the power and intention to exercise dominion over, the artifacts.[12] The grand jury was told that the artifacts were "reburied" in Kanupa Cave in 2000 or 2003. Kanupa Cave was impenetrable because there was a "rock" "blocking the cave entrance[.]" However, there was no evidence presented to the grand jury that from the time of reburial, when the items were allegedly restored to the original site, to the time they were removed, the artifacts were actually or constructively possessed by another.

### B.

Respondent also did not present evidence that any person had a property interest in the artifacts. Rather, Respondent relies on Kaikana's answer to a grand juror's question to the effect that Hui Malama, OHA, Bishop

---

12. Respondent appears to agree, inasmuch as at oral argument before this court, Respondent did not "concede" that no entity possessed the arti-

facts, but declined to answer whether there was any evidence of constructive possession presented to the grand jury.

Museum, and the State reburied and repatriated the artifacts, provided the grand jury with evidence that one or more of those four entities had an "other interest" in the artifacts and perhaps a "cultural" interest. But some "interest" or a "cultural" interest is not sufficient to satisfy the element of property of another inasmuch as it does not indicate that some person had a *property* interest in the artifacts.[13]

Moreover, the mere references to repatriation and reburial in answer to the grand juror's question, and the State's reference to repatriation when asking whether the artifacts were "eventually repatriated from both the Bishop Museum and the Peabody Essex[ Museum,]" would not indicate to any conscientious juror that repatriation and reburial vested some entity with any property interest in the artifacts. "[R]epatriate" is defined as "to restore or return to the country of origin, allegiance, or citizenship[,]" and "burial" is defined as "the act or process of burying[.]" *Merriam Webster's Collegiate Dictionary* at 153, 991 (10th ed.1993). Taking these words in their ordinary meaning, the mere fact that the artifacts were buried and "returne[d]" to their state of "origin," would not suggest, to a conscientious grand juror, that any person had a property interest in those artifacts at the time they were taken by Petitioner. The terms repatriation

and reburial have no material meaning in this case outside of NAGPRA. Obviously Respondent did not present its case to the grand jury based on facts establishing an interest derived from NAGPRA, inasmuch as the evidence presented to the grand jury focused on ownership by virtue of the Emerson Collection and by the museums.

Pursuant to NAGPRA, when a Native Hawaiian organization requests the return of "sacred objects or objects of cultural patrimony" and presents evidence that the "museum [currently housing such objects does] not have the right of possession" to those objects, such museum must repatriate or return such objects to the Native Hawaiian organization unless the museum can prove that it has a "right of possession"[14] to the objects.[15] 25 U.S.C. § 3005(c); 43 C.F.R. 10.10(a). "This provision of NAGPRA means that if a museum has ... ceremonial or sacred objects[,] the museum does not have *valid title to them,* and they must be repatriated." John Alan Cohan, *An Examination of Archeological Ethics and the Repatriation Movement Respecting Cultural Property,* 27–SPG Environs Envtl. L. & Pol'y J. 349, 419 (2004). Thus, the "repatriation" of such items to the appropriate organization is only legally sanctioned under NAGPRA. 25 U.S.C. § 3005(c); 43 C.F.R. 10.10(a). Conse-

---

**13.** The majority acknowledges that the State presented no authority to support the proposition that a "cultural interest" would qualify as an "other interest" under HRS § 708–800. Majority opinion at 753 n. 29. Nevertheless, the majority asserts that it "express[es] no opinion with regard to [the] merits" of the State's argument since it concludes "that someone other than [Petitioner] had a possessory interest in the artifacts[.]" *Id.* However, the State specifically advances Hui Malama, OHA, Bishop Museum, and/or the State as being the entity or entities with an interest in the artifacts. Inasmuch as no other person or entity aside from Emerson, the museums, and the aforesaid entities is mentioned, none of whom the majority identifies as having an interest or was shown to the grand jury to have had an interest in the artifacts at the time they were taken, the record is simply devoid of the existence of that "someone" who allegedly had a "possessory interest." *Id.*

**14.** Under NAGPRA, a right of possession is defined in pertinent part as "possession obtained with the voluntary consent of an individual or

group that had authority of alienation. The original acquisition of a. sacred object or object of cultural patrimony from [a] ... Native Hawaiian organization with the voluntary consent of an individual or group with authority to alienate such object is deemed to give right of possession of that object[.]" 25 U.S.C. § 3001. None of the elements fitting the NAGPRA definition of "possession" was presented to the grand jury.

**15.** Kaikana testified that he reviewed the plea agreement and that the artifacts had been repatriated from both the Bishop Museum and Peabody Essex Museum. Although the contents of the plea agreement were not presented to the grand jury, the plea agreement indicated that Petitioner admitted to "transport[ing] for sale and profit" and conspiring with other "to sell, use for profit, and transport for sale and profit" "cultural items obtained in violation of [NAGPRA]" "that had been repatriated and re-buried at Kanupa Cave." As noted before, the term "repatriation" has no relevant meaning outside the context of NAGPRA, and the actual facts of this case as one originating in NAGPRA was never disclosed to the grand jurors.

quently, under NAGPRA, when an item is repatriated to a Native Hawaiian organization, at the time of repatriation, that organization may have actual possession of that item and, also, "a right of possession" of that item. *See Francis P. McManamon & Larry v. Nordby, Implementing the Native American Graves Protection and Repatriation Act,* 24 Ariz. St. L.J. 217, 219 (1992) ("NAGPRA ... affirms the right of such individuals or groups to decide disposition or *take possession* of such items.") (Emphasis added.) When items are repatriated to more than one Native Hawaiian organization, at the time of repatriation, those entities could have "joint" constructive possession of those items. *Cf. Castro Romero v. Becken,* 256 F.3d 349, 354 (5th Cir.2001) ("NAGPRA establishes rights of tribes and lineal descendants to obtain repatriation of human remains and cultural items from federal agencies and museums[.]"). NAGPRA thus suggests a Native Hawaiian organization, at the time of repatriation, could have a *property interest and possession* of artifacts that were repatriated to it.

NAGPRA, however, does not direct the Native Hawaiian organization to do anything with the items upon repatriation. In other words, NAGPRA does not indicate that the Native Hawaiian organization must rebury, keep, enshrine, memorialize, or possess the artifacts. It follows, then, that a Native Hawaiian organization that has possession of, and a property interest in, an artifact due to repatriation, may lose possession of the artifacts and property interest prior to the time they were taken.

However, no mention of NAGPRA or the facts constituting a NAGPRA claim, or continuing possession by a Native Hawaiian organization[16] were presented to the grand jury.[17] Hence, whether or not any property interest under the statute existed at the time Petitioner took the artifacts from the cave would not be known to, or could be considered by, the grand jury in the absence of facts presented to it establishing a NAGPRA-related property interest. Indeed, without the presentation of facts supporting a property interest in a Native Hawaiian organization, a grand juror acting meticulously, carefully, or scrupulously could not entertain an urgent or compelling belief that a Native Hawaiian organization had any property interest in the artifacts that were repatriated or reburied.[18] Based on the foregoing, there was no evidence presented to the grand jury that would enable a cautious person to entertain a "strong suspicion" that Petitioner obtained or exerted control over artifacts that another person had direct physical control over, or knowingly had the power and intention to exercise dominion over, or that another person had a property interest in, the artifacts.

## IX.

Respondent's switching of theories at every stage of litigation only underscores the infirmity of the indictment. It is plain that throughout the proceedings Respondent has been in search of a theory that would support the indictment. Its theories have been inconsistent, thereby blowing "hot and cold" throughout this case. *See Roxas v. Marcos,*

16. Kaikana's reference to Hui Malama and OHA would not indicate to the grand jury that those *organizations were Native Hawaiian organizations* as described in NAGPRA. Nor would any conscientious juror be able to infer that Hui Malama or OHA was a Hawaiian organization as described in NAGPRA. Respondent conceded as much during oral argument, stating that the evidence that Hui Malama and OHA are statutorily defined by NAGPRA as Native Hawaiian organizations was not in the grand jury transcript.

17. NAGPRA also provides for the repatriation of human remains, associated funerary objects, and unassociated funerary objects in addition to sacred objects and objects of cultural patrimony.

*See* 25 U.S.C. § 3005(a); 43 C.F.R. § 10.10. The foregoing discussion illustrates that a Native Hawaiian Organization conceivably could have had a possessory or property interest in the artifacts at the time they were taken by Petitioner, but that no such evidence was presented to the grand jury in this case. As noted *supra,* NAGPRA itself does not require retention of a possessory interest *after* repatriation.

18. The majority asserts that the State was not required to specify which entity or entities had a possessory or other interest in the artifacts. Majority opinion at 755. However, as elucidated by the foregoing discussion, there was *no evidence* presented to the grand jury suggesting that *any* entity retained such an interest in the artifacts.

89 Hawai'i 91, 124, 969 P.2d 1209, 1242 (1998) (noting that parties cannot play "fast and loose with the court or blow[ ] hot and cold during the course of litigation.") (internal quotation marks and citation omitted); *cf. State v. Rodrigues,* 67 Haw. 496, 498, 692 P.2d 1156, 1158 (1985) (noting that, because the prosecution offered only one theory, this court would not review new, alternative theories on appeal).

### A.

Respondent's first theory was that Petitioner did not own the artifacts and that the property belonged to another. However, Respondent failed to present evidence to the grand jury that the property belonged to another, inasmuch as it did not show that the artifacts were in the possession of any person, and did not show that any person had any property interest in the artifacts at the time Petitioner took them. *See* discussion *supra.* Indeed, insofar as Respondent attempted to do so, its presentation was misleading, as discussed *infra.*

Respondent's subsequent argument to the court was that because Kanupa Cave is located on State property, pursuant to HRS § 6E–7 the artifacts were "historic property" and, thus, the property of the State. However, there was no evidence presented to the grand jury that Kanupa Cave was on State land, as Respondent conceded in oral argument, or that the State had any "historic property" interest in the artifacts. Thus, Respondent's "HRS § 6E–7" argument, as

indicated *supra,* cannot sustain the indictment.

### B.

On appeal to the ICA, perhaps realizing that there was insufficient evidence that the artifacts were the property of another, Respondent changed its theory and argued for the first time that Petitioner could not "claim ownership in the stolen property[,]" which is the only issue "important for prosecutorial purposes[.]" (Citing *Nases,* 65 Haw. at 218, 649 P.2d at 1139–40.) [19] But as the majority notes, the ICA was wrong in stating that evidence that the property was not that of Petitioner was enough to support the indictment. Majority opinion at 755. "Property" is defined in HRS § 708–800 in pertinent part as "any money, personal property, real property, thing in action, evidence of debt or contract, or article of value of any kind." An item may not be the property of the defendant, but it may also not be the "property" of any person, because someone does not possess it or have any property interest in it at the time of the taking. Along these lines, the ICA erred in determining that the fact the artifacts "*once* were possessed" by Emerson and the Museums was sufficient to establish that they were the property of another. *Taylor,* 2011 WL 661793, at *9 (emphasis added). The items must be *currently* "possessed" by another person at the time of the deprivation in order to charge Petitioner with theft. Thus, Respondent's third theory was legally wrong.

---

**19.** It bears mentioning that the facts and holding of *Nases* have no bearing on the instant case. There, the defendant went into "Kalakaua Kleaners[,]" of which Setsuko Yokoyama was the manager and owned its stock. 65 Haw. at 218, 649 P.2d at 1139. The defendant took a calculator that was on the counter, and was subsequently convicted of theft in the third degree, a misdemeanor because he stole the calculator. *Id.* at 217, 649 P.2d at 1139. In the charge, the calculator was alleged to be the property of "Setsuko Yokoyama doing business as Kalakaua Kleaners," *id.* at 217–18 649 P.2d at 1139, whereas the calculator was proven to be the property of Kalakaua Kleaners. The defendant argued that there was a fatal variance in the charge and the proof. *Id.* This court rejected that argument, noting that it was "undisputed" that the calculator "was the property of another[,]" and determining that

"there is no fatal variance between the charge and the proof." *Id.*

Thus, all that can be extracted from *Nases* is that, when there are two entities that could have legally owned the calculator, and the two entities were similar, that one entity was alleged in the charge does not render fatal the fact that it was determined the calculator was the property of the other similar entity. Thus, presumably, if the instant case went to trial and it was proven that the artifacts belonged to the *State, Nases* may be relied upon for the argument that there is no "fatal" variance between the charging document (insofar as it just says that Petitioner took property from another) and the evidence presented at trial. However, it has no bearing on the sufficiency of the evidence presented to the grand jury to return an indictment in the first place and, thus, is irrelevant to the instant case.

### C.

On certiorari, Respondent argues to this court, for the first time in its Opposition, that the Hawaiian entities that were involved in repatriation have a "cultural" interest in the artifacts. To reiterate, no evidence of a "cultural" interest in any particular Hawaiian entity was presented to the grand jury within the framework of NAGPRA because that was not Respondent's theory at that time. Hence, this theory also cannot validate the indictment.

"[T]he[ ] personal beliefs," *Dalton*, 894 F.Supp. at 1409 n. 9, of Native Hawaiian organizations such as Hui Malama, which may have had cultural ties to the artifacts, must be respected. However, Respondent failed to present to the grand jury a cultural connection within the purview of a property interest as defined in HRS § 708-800. A cursory review of the federal register indicates that some of the items at issue were noticed to be repatriated. *See* Notice of Intent to Repatriate Cultural Items in the Possession of the Peabody Essex Museum, Salem, MA, 66 Fed.Reg. 63, 17572-17573 (Apr. 2, 2001) (noting that unassociated funerary objects found by J.S. Emerson in Kanupa Cave were to be repatriated to Hui Malama I Na Kupuna O Hawai'i Nei, Ka Lahui Hawai'i, and OHA).[20]

### D.

Further, at oral argument Respondent declined to identify the nature of the "interest" upon which Respondent relied. Respondent also retreated from its chapter 6E theory,

saying that the State does not "depend" on HRS chapter 6E for purposes of sustaining the indictment, but merely cites it for the purpose of giving the State an interest that can be proven at trial, thus contradicting what it had represented to the court and to this court,[21] and more importantly to the grand jury.

To reiterate, Respondent stated in its supplemental memorandum to the court that "Kanupa Cave, where the artifacts comprising the J. Emerson [C]ollection that were re-interned, *is located on State property.* Therefore, *pursuant to [HRS] section 6E-7, [all] objects* [,] ... *including the re-interned Hawaiian artifacts, are 'historic property.'* " (Emphases added.) In that memorandum, Respondent "argue[d] that the ... *artifacts are the property of another, the State* [.]" (Emphasis added.) Thus, it is plain that Respondent had argued that the artifacts were "property" of the State, in conflict with its subsequent position. Respondent's effort to find a theory to support the indictment confirms what is manifest: that there was no evidence presented to the grand jury that the artifacts were the property of another at the time of the taking, as necessary to establish probable cause that theft was committed by Petitioner.

### X.

A second independent ground warranting dismissal of the indictment is that Kaikana's testimony was misleading in indicating that

20. I take judicial notice of the following newspaper article indicating repatriation occurred. *See* Hawai'i Rules of Evidence (HRE) Rule 201(b) (indicating that a judicially noticed fact must be "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned"); *see also Allen v. City & County of Honolulu*, 58 Haw. 432, 438, 571 P.2d 328, 331 (1977) (taking judicial notice of the facts "from the newspapers at the time"). In the instant case, the following fact is "capable of accurate and ready determination" if one reviews the federal register. *See* Sally Agpa, *Place of Unrest, Artifacts found on the black market hail from this disturbed crypt*, Honolulu Star Bulletin, Aug. 26, 2004 ("According to the Federal Register[,] ... the items from the Bishop Museum, which still had their identification stickers, were

repatriated to three native Hawaiian organizations in 1997: Hui Malama I Na Kupuna O Hawaii Nei ("group caring for ancestors of Hawaii"), OHA and the Hawaii Island Burial Council[,]" and "[t]he items from the Peabody Essex [Museum], which also had identification stickers, were repatriated to Hui Malama, OHA and Ka Lahui Hawaii in the spring of 2003, according to the Federal Register.").

21. As noted before, Respondent argued in its Opposition that "the State has a legally cognizable interest in the artifacts, pursuant to HRS chapter 6E, *for purposes of this prosecution* [,]" (emphasis in original), and the State had an " 'other interest' for the ... reason it owns the land upon which the artifacts were placed."

the property belonged to the Emerson Collection or the Museums.[22]

## A.

The evidence that was presented would lead the grand jury to believe that the artifacts were the "property" of the Emerson Collection, the Peabody Essex Museum, or the Bishop Museum at the time Petitioner took them from the cave. The grand jury was told, repeatedly, that artifacts belonged to [23] the Emerson Collection that were partly sold to [24] the Peabody Essex Museum and the Bishop Museum. The grand jury was informed that Petitioner acknowledged that the items belonged to the Emerson Collection,[25] Petitioner knew that the items were part of that collection,[26] the artifacts were indeed part of the Emerson Collection,[27] from the Peabody Museum, and that the artifacts contained Emerson labels identifying them as being part of the Peabody collection, and the Bishop Museum and that Petitioner removed the labels to sell them.

Based on Respondent's presentation, a grand juror would be left to believe that, after the repatriation and burial, followed by the removal of Emerson tags by Petitioner from the artifacts, the Emerson Collection, the Bishop Museum, or the Peabody Essex Museum retained some interest in the property, not that the artifacts were the property of another entity. Nothing was said of NAGPRA and the involvement of the State, Hui Malama, OHA or the Bishop Museum because of NAGPRA. Thus, it would be pure speculation, not strong suspicion by a conscientious grand juror, to infer that the State, Hui Malama, OHA, or the Bishop Museum retained a possessory or other property interest in the artifacts inasmuch as *there are no facts at all in the record that such is the case.*

Instead, the evidence presented to the grand jury was by way of Kaikana's testimony which essentially mirrored the contents of the federal court plea agreement supporting Respondent's conviction for a federal offense with elements different from that of HRS §§ 708–830(1) and 708–830.5(1)(a). Plainly, the defect in Respondent's case is that its presentation to the grand jury followed along the lines of the plea agreement which rested on the artifacts having been Native Hawaiian cultural items, Petitioner's knowledge that they were such cultural items, and his sale of those cultural items—matters, not sufficient to establish that anyone retained a possessory or ownership interest in the artifacts at the time they were taken, as required under HRS §§ 708–830(1) and 708–830.5(1)(a). Thus, although Respondent relied on the contents of the federal plea agreement, there was insufficient evidence therein to satisfy the elements of HRS §§ 708–830(1) and 708–830.5(1)(a), the state theft statute. The plea agreement was obviously intended to support the federal offense and that offense did not

22. Implicit in Petitioner's argument that the evidence presented to the grand jury could not sustain the indictment is the assertion that the evidence presented was misleading. If the evidence, which suggested that the museums or the Emerson Collection had the artifacts, could not support the indictment because it was impossible for those entities to have had any possession of or property interest in those artifacts, as Petitioner contends, then, necessarily, the evidence suggesting as such was misleading (Petitioner argued that it was *"particularly egregious"* that "the State pitched a legally impossible theory to the grand jury to indict [Petitioner.]") (Emphasis added.)

23. Kaikana testified that Emerson "put Emerson tags" on the items he "collected[,]" answered "Yes[ ]" when asked if Petitioner knew the items belonged to the Emerson Collection, and answered [y]es[ ]" when asked if items "were a part of the Emerson Collection[.]"

24. Kaikana testified that Emerson sold the items he took from Kanupa Cave to the "Bishop Museum and Peabody Museum in Massachussetes [sic]."

25. Kaikana answered "Yes[ ]" when asked if Petitioner had acknowledged that he knew the items belonged to the Emerson Collection.

26. *See supra* note 25.

27. Kaikana answered "Yes[ ]" when asked if the artifacts were "from the [Emerson C]ollection[,]" and confirmed that the items were "[f]rom the Peabody Museum[,]" when asked if the items were a part of the Emerson Collection, and answered yes when asked if the items were "part of the Emerson Collection from the Peabody Museum[.]"

require a showing that the artifacts were the property of another.

### B.

This court has affirmed dismissal of an indictment based on misleading evidence. *See State v. Wong*, 97 Hawai'i 512, 514, 516, 40 P.3d 914, 916, 918 (2002). In *Wong*, a grand jury returned an indictment charging Henry Peters (Peters), a former Bishop Estate trustee, with theft and criminal conspiracy, and Jeffrey Stone (Stone) with, *inter alia*, criminal conspiracy and accomplice to theft. *Id.* at 516, 40 P.3d at 918. It was alleged that Stone secured the sale of Peters' residential apartment for $192,500 more than its alleged value. *Id.* The indictment stated, among other things, that Peters was induced to approve Stone's acquisition of a construction project on Bishop Estate land and Stone convinced another person to pay $192,500 more for Peters' apartment than it was worth. *Id.* at 514, 40 P.3d at 916. It was alleged that $192,500 should belong to Bishop Estate, and Peters' retention of that value was a theft from Bishop Estate.

The State called Nathan Aipa, then chief operating officer and formerly General Counsel for the Estate, to explain whether "Peters knew that any benefit he received from a transaction in which the trust was also involved needed to be returned to the trust[,]" and asked him about an unrelated matter, the "McKenzie Methane investment," for which legal advice was sought and conveyed to the Bishop Estate trustees. *Id.* at 516, 40 P.3d at 918. Regarding the McKenzie Methane investment, Aipa testified that the trustees "were advised about the ethical propriety of investing in projects related to [Bishop] Estate's investments in McKenzie Methane; that it might be a breach of trust for a trustee to invest in an investment related to the Estate's investment; and that Peters had invested in McKenzie Methane." *Id.* at 523, 40 P.3d at 925.

According to this court, "[t]he limited testimony the State elicited from Aipa left the impression that Peters' investment in the McKenzie Methane matter was a breach of trust[,]" and "wrongfully implied that Peters had breached his fiduciary responsibility then and was in breach of trust again in the matter before the grand jury." *Id.* In this court's view, "[l]eaving the grand jury with such a misleading inference 'undermined the fundamental fairness and integrity of the grand jury process' and prevented the grand jury 'from the exercise of fairness and impartiality' with regard to Peters that due process demands." *Id.* (quoting *Chong*, 86 Hawai'i at 284, 949 P.2d at 124 (1997) (emphasis added)). This court concluded that "[t]he State's presentation of Aipa's testimony clearly induced an action other than that which grand jurors in uninfluenced judgment *would have deemed warranted on evidence fairly presented to them.*" *Id.* at 523, 40 P.3d at 925 (emphasis added).

Similarly, Kaikana's testimony that the artifacts "belonged" to, or were a "part" of, the Emerson Collection, or that the items were a "part" of the Emerson Collection from the Peabody Museum, or the Bishop Museum, "left the impression" that the artifacts belonged to one of those entities, "wrongfully impl[ying,]" *id.*, that those entities still had possession of or a property interest in the artifacts at the time the artifacts were taken. "Leaving the grand jury with such a misleading inference" "undermined the fundamental fairness and integrity of the grand jury process" inasmuch as the grand jury was improperly led to believe that the artifacts were the "property" of one of the entities. *Id.* (internal quotation marks and citation omitted).

Putting aside improper evidence, remaining evidence may be sufficient to support an indictment. For example, in *State v. Scotland*, 58 Haw. 474, 476, 572 P.2d 497, 498 (1977), this court reversed the circuit court's quashing of the indictment for the offense of promoting a harmful drug. The circuit court had determined a police detective's statement to the grand jury that he knew the defendant "had been pushing drugs" should result in dismissal of the indictment. *Id.* at 478, 572 P.2d at 498.

However, this court noted that "where sufficient legal and competent evidence is presented to a grand jury, the reception of illegal or incompetent evidence would not

authorize the court to set aside an indictment *if the remaining legal evidence, considered as a whole, is sufficient to warrant the indictment." Id.* at 476, 572 P.2d at 498 (emphasis added). It was determined that there was sufficient legal and competent evidence, aside from the statement, to return an indictment. This court relied on the fact that an undercover police officer testified to the grand jury that the defendant attempted to sell cocaine to him, and actually sold hashish to him, and that the defendant told him that if the police officer was interested in purchasing more, the defendant would be in contact with him. *Id.* at 477, 572 P.2d at 499.[28]

In the instant case, putting aside Kaikana's misleading testimony, there was no "remaining legal evidence[,]" *Scotland,* 58 Haw. at 476, 572 P.2d at 498, to indicate that the artifacts were the property of another. Although Kaikana answered that Hui Malama, OHA, the State, and the Bishop Museum repatriated and reburied the artifacts, that testimony would not suggest that the artifacts were in the possession of another or that those entities had any property interest in the artifacts at the time of the taking. To reiterate, without knowledge of NAGPRA and/or the presentation of facts establishing a NAGPRA property interest, a cautious conscientious juror would have no way to suspect that the artifacts were the property of another person when they were taken in 2004. Here, it is evident that Petitioner was unfairly prejudiced, inasmuch as, without the misleading testimony, there was no evidence to suggest that the artifacts were the property of another. *See Scotland,* 58 Haw. at 477, 572 P.2d at 499 (noting that a specific showing of prejudice is necessary to make a court's dismissal of the indictment erroneous).

## XI.

Based on the foregoing, I would reverse the ICA's judgment, vacate the court's order, and remand for dismissal of the indictment without prejudice.

## XII.

In the majority's view, (1) "multiple parties could have a concurrent or shared property interest" in the artifacts, majority opinion at 753 n. 29, (2) the "value of the items and the manner and circumstances in which they were reburied were sufficient to create a 'strong suspicion' that someone other than [Petitioner] retained a right of possession in the artifacts and that the items were accordingly the "property of another' when [Petitioner] took them[,]" *id.* at 755; and (3) it can be inferred "that the artifacts had been purposely secreted in the cave and not simply discarded[,]" *id.* at 754.

### A.

First, even if HRS § 708–800 contemplates that multiple parties have a "shared property interest" or shared possessory interest,[29] ma-

---

**28.** Similarly, in *Freedle,* 1 Haw.App. at 402, 620 P.2d at 741, the ICA determined that there was sufficient evidence to support an indictment charging manslaughter. There, the decedent was issued parking tickets, and when the decedent protested, an altercation developed between the decedent and the defendant, Officer Freedle, during the course of which the decedent was killed. *Id.* At the grand jury proceeding, there was testimony that Officer Freedle pushed the decedent up against the police car, reached for his gun, and the gun fired. *Id.* at 397, 620 P.2d at 741. This court determined that there was sufficient evidence to support an indictment of manslaughter, reasoning, "It flies in the face of reason to say that the grand jurors, as men of ordinary caution, could not have believed and conscientiously entertained a strong suspicion that" the defendant "in drawing his firearm under these circumstances, consciously disregarded a substantial and unjustifiable risk that his con-

duct would cause the gun to discharge and thus, cause the death of the decedent." *Id.* In the instant case, "[i]t flies in the face of reason to say that the grand jurors, as [persons] of ordinary caution[,]" *id.,* would believe that the artifacts were the property of another at the time they were taken based on the sole fact that some entities convened and reburied the artifacts.

**29.** I read the majority's reference to a "shared property interest" to mean only that possession of an item can be jointly held, a proposition established in this jurisdiction. *See* discussion *supra; see also* Hawai'i Criminal Jury Instruction No. 6.06 (noting that possession of an item can be jointly held). Similarly, I believe a shared possessory interest means only that joint constructive possession of an item is possible. *See id.*

jority opinion at 753 n. 29, the majority fails to explain what evidence was presented to the grand jury indicating that "multiple parties" had any "shared *property* interest[,]" *id.* (emphasis added), or a shared possessory interest in the artifacts that were taken from Kanupa Cave.

In the instant case, in presenting its case to the grand jury, the State did not have any theory of ownership. The majority in fact acknowledges this. *See* majority opinion at 753 n. 28 ("[T]he State ... did not explicitly identify *any* specific theory of ownership during its presentation to the grand jury.") The majority mentions several entities throughout its opinion, implicitly suggesting that at least one or more of them could have had an interest in the artifacts. However, the only evidence presented to the grand jury was that the artifacts were reburied and were said to have belonged to the Emerson Collection and Bishop Estate and Peabody Essex Museums. *See* discussion *supra.* As explained before, and as acknowledged by the majority, majority opinion at 753 (noting that only the individual or organization to whom the artifacts were repatriated would have any right of possession), the Emerson Collection, Peabody Essex Museum, and Bishop Museum did not have any "property interest" in the artifacts, or possession of the artifacts. Thus, as stated, the evidence was misleading.

The majority argues that Kaikana testified that J.S. Emerson took the artifacts out of the cave, sold them to the Bishop Museum and Peabody Essex Museum, and in turn, the artifacts were repatriated from the museums and reburied.[30] Majority opinion at 754–55. Thus, the majority asserts that the evidence did not leave the impression that the artifacts continued to belong to either museum. *Id.* at

755 n. 32. The majority additionally points out that artifacts bore Emerson tags or labels, Petitioner knew the artifacts belonged to the Emerson Collection, and that Petitioner took the Emerson tags off the artifacts when he attempted to sell them, *see* majority opinion at 754–55, to support its conclusion that there was sufficient evidence that "someone" had a possessory or ownership interest in the artifacts. Majority opinion at 755.

But, under the grand jury testimony, if neither J.S. Emerson nor the museums had an interest, then who had an interest? The grand jury returned an indictment stating that Petitioner "obtain[ed] or exert[ed] unauthorized control over the property of another," thus indicating that it believed someone had an ownership or property interest in the artifacts.[31] The majority fails to indicate who "another" was and who had an interest. This is not surprising because, as noted previously, the record, much less the grand jury transcript, is devoid of any facts indicating that any entity was vested with a possessory or property interest at the time of taking.

As noted *supra,* under NAGPRA, a Native Hawaiian organization could conceivably have had a possessory interest but no evidence indicating that such was the case was presented to the grand jury. "Repatriation" provided for in NAGPRA was never explained to the jury and so no inference could be drawn of possession or interest in the artifacts in any entity at the time they were taken by Petitioner. While the majority maintains that the identity of "another" under the theft statute need not be specified, nothing indicates that *anyone* had an interest in the artifacts based on the evidence presented.

---

30. The grand jury was told that J.S. Emerson took artifacts out of Kanupa Cave and sold not all of but "part of" or "some of" those artifacts to the Bishop Museum and the Peabody Essex Museum.

31. To reiterate, the transcript is replete with references to the artifacts belonging to the Emerson Collection, the artifacts bearing Emerson labels, Petitioner having acknowledged and knowing that the items belonged to the Emerson Collection, part of the J.S. Emerson artifacts having

been sold to the Bishop Museum and Peabody Essex Museum, and the artifacts being part of the Emerson Collection from the Bishop Museum and Peabody Essex Museum. Because, NAGPRA was not referenced, repatriation was not defined, and no Hawaiian organization was mentioned with respect to NAGPRA, it is inconceivable that the grand jury believed that an entity other than the J.S. Emerson collection or one of the museums had an interest in the artifacts at the time they were taken.

### B.

In addition, contrary to the majority's position, the artifacts' value and the manner and circumstances in which they were reburied would not lead a conscientious and prudent juror to entertain a "strong suspicion" that they were the property of another. Majority opinion at 754–55. The apparent value of the objects does not indicate that the objects were the property of another for the plain reason that value has no connection to whether a person had possession of the artifacts, or a property interest in the artifacts. *Jenkins*, 93 Hawai'i at 110, 997 P.2d at 36.

The value of the artifacts is not relevant to the element of whether the defendant obtained or exerted control over the property of another, *Duncan*, 101 Hawai'i at 279, 67 P.3d at 778, inasmuch as the value of items has no connection to the conduct of the defendant in obtaining or exercising control over the items. Instead, value is an attendant circumstance element relevant only to the degree of the charge. *See* HRS § 708–830.5(a) (noting that theft in the first degree is committed when the person takes property or services, "the value of which exceeds $20,000"); HRS § 708–831(1)(b) (stating that theft in the second degree is committed when the person takes "property or services the value of which exceeds $300"); HRS § 708–832(1)(a) (providing that theft in the third degree is committed when the person takes "property or services the value of which exceeds $100"); *see also State v. Cabrera*, 90 Hawai'i 359, 361, 978 P.2d 797, 799 (1999) (noting that, in a charge of second-degree theft, the "attendant circumstance" was the

"value" of property). Thus, the value of the artifacts is not indicative, or evidence, of whether Petitioner obtained or exerted control over the property of another, the question at issue here.

As to the "manner and circumstances" of the artifacts' burial, the grand jury was not presented with any facts regarding the "manner and circumstances" that would indicate that they were the property of another because it was not told about NAGPRA, the facts establishing a NAGPRA claim, or that artifacts could be repatriated to a Native Hawaiian organization under NAGPRA, thereby potentially giving such an organization actual possession of, and a property interest in, the artifacts;[32] or, alternatively, that Kanupa Cave was on State land, and, consequently, under HRS chapter 6E the State had a property interest in the artifacts, inasmuch as it owned the cave. The description of the artifacts and its location (in a cave) and the circumstances of its burial would not, to a meticulous, careful, or scrupulous person, result in the urgent or compelling suspicion that another person had possession of, or a property interest in, the artifacts at the time that they were later taken.

### C.

The majority's suggestion that it can be "reasonably inferred" that the artifacts were "purposely secreted" and not "discarded" inasmuch as the cave entrance had been covered with a rock, the items were enclosed in cloth, and reburial had been undertaken, ma-

---

**32.** Along the same lines, the majority posits that "assuming" the artifacts were "repatriated pursuant to NAGPRA as [Petitioner] suggests, the artifacts would have been repatriated to a culturally affiliated organization or lineal descendant[, and that] individual or organization ... would have had a right of possession in the artifacts *at the time the artifacts were repatriated.*" Majority opinion at 753 (emphasis added) (internal citation omitted). First, it is not Petitioner who "suggests" that the artifacts were repatriated pursuant to NAGPRA. Rather, this proposition originates in the federal plea agreement. The majority's statement that repatriation would have meant that an individual or organization would have had a right of possession in the artifacts at the time of repatriation does not establish this as a matter of fact inasmuch *as repatriation under*

*NAGPRA was never explained to the grand jury.* Moreover, no entity was identified as a "culturally affiliated organization" or "lineal descendant" since no evidence regarding NAGPRA or any NAGPRA-related claim was presented to the grand jury. Finally, it is irrelevant whether someone could have retained an interest in the. artifacts at the time the artifacts were repatriated. The relevant issue in this case is whether there was any evidence presented to the grand jury that anyone retained a possessory or property interest in the artifacts *at the time they were taken.* Hence, the grand jury could not have entertained a compelling suspicion that an individual or entity had possession of, or a property interest in, the artifacts at the time that they taken inasmuch as that theory was *simply never presented to the grand jury.*

jority opinion at 754, cannot be drawn from the facts. Without the actual facts underlying repatriation and reburial, placement of items in the cave, either in 2000 or 2003, would not lead a conscientious juror to "infer" that, at the time the items were later taken in 2004, any entity involved in the repatriation retained possession of, or a property interest in, the artifacts. The placement may have been for the purpose of returning the items to their original condition or setting, or an expression of the reverence owed to the artifacts. However, without any predicate facts, a grand juror could not conscientiously infer that the placement meant that a right of possession continued in another person up until the time the artifacts were taken. The State's presentation of evidence to the grand jury simply did not rest on the actual facts of the case.

### XIII.

Based on the foregoing, I must respectfully dissent. As noted, Respondent may have been able to present evidence sufficient to establish probable cause, but simply failed to do so. It is manifest Respondent did not do so because in deciding that it was acceptable to simply inform the jury that the property belonged to the Emerson Collection and once was housed in the Peabody Essex Museum or the Bishop Museum, it applied an erroneous construction of the theft statute. The resulting journey from the court to this court has been a series of failed alternative theories that do not conform to the evidence presented to the grand jury. To uphold the indictment would usurp our announced adherence to the proposition that an indictment must only be returned based on probable cause, *see Bell*, 60 Haw. at 242–43, 589 P.2d at 519 (noting that the grand jury must determine whether there is probable cause to believe that a crime has been committed), and that a defendant has a constitutional right to a fair and impartial grand jury proceeding, *see Joao*, 53 Haw. at 230, 491 P.2d at 1092 (stating that a defendant has a constitutional right to a fair and impartial grand jury proceeding). Respectfully, unless we take the grand jury's function seriously, this decision unfortunately lends credence to the often-repeated criticism that the grand jury has become a rubber stamp. *State v. Kahlbaun*, 64 Haw. 197, 203, 638 P.2d 309, 315 (1981) ("Rather than being a shield to unfounded charges as intended, critics charge that the grand jury has become a rubber stamp of the prosecuting attorney.").